# Order

**Michigan Supreme Court**
**Lansing, Michigan**

July 31, 2008

Clifford W. Taylor,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman,
Justices

133847

In re Estate of JAMES W. MILTENBERGER,
Deceased.

_____

SUSAN EIFLER, Personal Representative
of the Estate of James W. Miltenberger,
Deceased,
            Appellee,
and

SHARON MILTENBERGER,
            Petitioner-Appellee,

v

SANDRA SWARTZ,
            Respondent-Appellant.

SC: 133847
COA: 270716
Calhoun Probate Ct:
        2004-000287-DE

_____/

On order of the Court, leave to appeal having been granted and the briefs and oral arguments of the parties having been considered by the Court, we VACATE our order of December 13, 2007. The application for leave to appeal the March 27, 2007 judgment of the Court of Appeals is DENIED, because we are no longer persuaded that the question presented should be reviewed by this Court.

KELLY, J., concurs and states as follows:

I concur in Justice Corrigan's statement with one exception. I find her discussion of the feasibility of gender-neutral dower interesting but irrelevant to intermediate-scrutiny analysis. The current dower statutes pass intermediate scrutiny on their own merits, not because a gender-neutral alternative might be impossible.

Justice Corrigan's questions about the feasibility of a future alternative to gender-based dower stem from the following proposition in *Orr v Orr*: "Where, as here, the State's compensatory and ameliorative purposes are as well served by a gender-neutral classification as one that gender classifies and therefore carries with it the baggage of sexual stereotypes, the State cannot be permitted to classify on the basis of sex."[1] *Orr* invalidated the Alabama alimony statute that required husbands, but not wives, to pay alimony.[2] The Court concluded that the statute already provided for individualized hearings to determine need; therefore, there was no reason "to use sex as a proxy for need."[3] *Orr* dealt with a statute that provided for a gender-neutral determination of need. The Court had no reason to consider whether a gender-based statute might pass constitutional muster if a future gender-neutral scheme were not feasible. Therefore, *Orr* does not require us to address in this case the feasibility of a hypothetical gender-neutral dower statute.

Justice Corrigan acknowledges that the feasibility of gender-neutral dower is best left initially to the Legislature. Moreover, the issue is not now before the Court. The parties neither briefed nor argued the feasibility of a gender-neutral dower statute in Michigan. On the contrary, they proceeded on the assumption that gender-neutral dower was a possible alternative to the existing dower statutes. They disagreed only about whether this Court should read the current statutes in gender-neutral terms.

Justice Corrigan asserts that gender-neutral dower is likely impossible. She reasons that the Legislature cannot affect the vested rights in real property to which a widower's dower right would attach if it passed a gender-neutral dower statute. However, this problem would occur only if this hypothetical statute applied retroactively. There is no reason to speculate about a problem that may not occur.

I agree with Justice Corrigan that the current dower statutes survive intermediate scrutiny. I express no opinion about the feasibility of a hypothetical gender-neutral dower statute, as that issue is not before the Court.

CORRIGAN, J., concurs and states as follows:

I concur, but write separately to respond to the dissent. I conclude that the gender distinction in Michigan's dower scheme is adequately justified by the well-documented

---

[1] *Orr v Orr*, 440 US 268, 283 (1979).

[2] *Id*. at 271.

[3] *Id*. at 281.

relative economic positions of widows and widowers in this state. Therefore, the Court of Appeals correctly concluded that dower survives equal protection review and declined to deprive the Legislature of this historical tool to aid widows, who, as a group, continue to occupy less favorable economic positions than their male counterparts.

## I. FACTS AND PROCEEDINGS

The dissent adequately recounts the straightforward facts of this case and the proceedings in the lower courts. I note only that the Attorney General has not participated in this case on behalf of the state of Michigan. It would have been useful to the Court to have had this issue briefed by the Attorney General.[4] I regret that the trial court did not exercise its discretion under MCR 2.209(D), which permits the court to "require that notice be given to the Attorney General" when "the validity of a Michigan statute . . . is in question in an action to which the state or an officer or agency of the state is not a party . . . ."

## II. STANDARD OF REVIEW

The dissent and I agree that intermediate scrutiny applies to equal protection review of laws that discriminate on the basis of gender. "To withstand constitutional challenge, . . . classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v Boren*, 429 US 190, 197 (1976). But, as I discuss further in part III(C) of this statement, this standard is a source of controversy, and the United States Supreme Court has provided insufficient guidance concerning its implementation.

I conclude that, under the intermediate scrutiny standard, dower withstands review because it is substantially related to important objectives: remedying economic discrimination against women and protecting needy spouses. The dissent's point is well-taken, however, that gender is an imperfect proxy for need among surviving spouses. Therefore, dower also appears to reflect gender stereotypes. But finding dower unconstitutional for this reason essentially amounts to review under the strict scrutiny standard reserved for laws discriminating on the basis of race or national origin. I acknowledge the dissent's comparison of my analysis to rational basis review, because I

---

[4] The dissent criticizes me for "eas[ing] the burden on the proponent of the classification by supplying data and arguments in support of the classification beyond that which the proponent presented." *Post* at 46. But I find it necessary to do so in response to the dissent's contention that we should declare a law unconstitutional on the basis of a defense offered by a single private attorney and without the benefit of briefing from the Attorney General on behalf of the state. Moreover, as I discuss further below, United States Supreme Court precedent illustrates that it is appropriate to rely on relevant data when considering the constitutionality of gender-based classifications.

find it necessary to consider real-world data to determine how well-suited dower is to its goals. But because real-world differences between men and women are the foundation of the intermediate scrutiny standard, intermediate scrutiny is unworkable if it requires us to presume that a gender-based distinction is unconstitutional, yet then eschew available statistics comparing the economic and social circumstances of men and women to rebut the presumption, as the dissent urges. Thus, until the United States Supreme Court provides further guidance on implementing intermediate scrutiny, I would not hold unconstitutional our Legislature's choice to retain the ancient right of dower even though it unavoidably reflects gender stereotypes.

## III. ANALYSIS

### A. IMPORTANT GOVERNMENTAL OBJECTIVES

The dissent and I agree that dower is aimed at important governmental objectives, because it provides support for needy surviving spouses and a remedy for past economic discrimination and lower earnings of women, which contribute to the higher vulnerability of women to poverty or low income after the death of a spouse. See *post* at 34 (stating that dower protects needy spouses and serves "the related purpose of compensating women for past discrimination and lower earnings during marriage, which often left them more vulnerable than men following the death of a spouse"). "[A]ssisting needy spouses is a legitimate and important governmental objective." *Orr v Orr*, 440 US 268, 280 (1979). "Reduction of the disparity in economic condition between men and women caused by the long history of discrimination against women" has also been recognized as "an important governmental objective." *Califano v Webster*, 430 US 313, 317 (1977); see also *United States v Virginia,* 518 US 515, 533 (1996) (*VMI*), citing *Webster*.[5] I concur generally in the dissent's analysis of the constitutionally sound objectives of Michigan's dower statutes. My only qualm with the dissent's analysis lies in its assertion that the "statutes at issue here are little more than recitations of the common law; thus, whether dower under these statutes serves a different or broader purpose than dower served at common law is somewhat questionable." *Post* at 33.

Without question, dower is a longstanding historical right that preexisted even the formation of our nation and that has become embedded in Michigan statutory and common law. The right of dower is "'so ancient, that its origin is now lost in doubt and

---

[5] In her brief, petitioner Sharon Miltenberger expands on the proposition that women earn less than their husbands during the course of their marriages. She observes that discrimination in the workplace and the traditional roles of married women have resulted in wives making significant noneconomic contributions to their husbands' estates. This may be particularly true of past generations of women who nonetheless face widowhood in the twenty-first century. Petitioner asserts that dower "protects the contribution the wife makes to her husband's estate."

uncertainty.'" *Pfau v Moseley*, 9 Ohio St 2d 13, 20 (1966), quoting *Dunseth v Bank of the United States*, 6 Ohio 77 (1833). As one scholar noted:

> From very early times, English law assured to a wife certain rights in her husband's property if she survived him. For centuries those rights have been known as dower. Although the word itself is of French origin, the provision in English law long antedates the coming of the Normans, and its precise beginnings are lost in the dim antiquities of the Germanic law which prevailed in England before the Conquest. The origins of dower take us back to a period in Teutonic history when the bridegroom made a payment to the kinsmen of the bride, in return for the rights over her which he acquired by the marriage, and gave to her a morning [sic] gift for her support if she outlived him. [Haskins, *The development of common law dower*, 62 Harv L R 42, 42 (1948).]

We do know that by at least 1225 the right of dower provided a widow with the right to a 1/3 share of her husband's property. The Magna Carta of 1225 stated: "[L]et there be assigned to [the widow] for her dower a third part of all the land of her husband which was his in his life, unless she was endowed of less at the church door."[6] Michigan recognized the common law right of dower in *May v Rumney*, 1 Mich 1 (1847). In closing the opinion of the Court, Justice Wing stated: "I can see no reason why courts should not now, as formerly, look upon the claim of dower with great favor, and maintain the truth of what Lord Coke says was commonly said, that three things be favored in the law—*life, liberty and dower*." *Id.* at 13 (emphasis in original). Because dower is so deeply engrained in historical Michigan and English law, we should not underestimate the significance of questioning its continued viability.

But, contrary to the dissent's suggestion, the historical nature of dower does not necessarily render its goals or means outdated. Recent history suggests that Michigan's policy-makers have concluded that women continue to rely on the historic right of dower, which is a useful means to various related ends that have evolved over time as women's rights and roles have changed. As the dissent recognizes, Michigan's citizens explicitly considered and retained dower both at the state's most recent constitutional convention in 1961 and when the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et*

---

[6]Magna Carta of 1225, as quoted in Comment, *The ins and outs of the Alabama elective share*, 58 Ala L R 1161, 1162 (2007). The Magna Carta of 1297 similarly stated that "[a]s dower [the widow] will be assigned the third part of all the lands of her husband which were his during his lifetime, save when she was dowered with less at the church door." National Archives and Records and Records Administration, Featured Documents <http://www.archives.gov/exhibits/featured_documents/magna_carta/translation.html> (accessed July 29, 2008).

*seq.*, was enacted in 1998. Although dower has operated in largely the same manner over time, we should not assume that the objectives it is intended to serve are unchanging.

The delegates to the 1961 Michigan constitutional convention debated at length the modern status of dower and whether it should be abolished.[7] Like the dissent today, *post* at 39-40, some delegates suggested that dower should be abolished because its protections are minimal in modern times. Bay County delegate Milton Higgs suggested that

> dower in itself is not a valuable thing to the wife, in view of her other rights. She can elect to take against the will, she has rights that are superior to this, and as Mr. [Robert] Tubbs has said, it's merely a right to the income to 1/3 of the property for life. This is a cumbersome thing to handle in property law. [2 Official Record, Constitutional Convention 1961, p 2445.]

Other delegates stated that they would not abolish dower precisely because it provides worthwhile minimum protection for women. Washtenaw County delegate Joseph Lawrence, Jr., observed that, for spouses who occupy traditional roles, dower "mean[s] that a husband who normally takes care of things cannot get rid of all his property without his wife having to sign off." *Id.* Perhaps most tellingly, Wayne County delegate Ann Donnelly argued that "[i]nchoate dower rights are of vital interest to the women" even before their husbands' deaths and protect "a married woman in the event of a divorce action." *Id.* She explained:

> I, regrettably, have been involved in representing women in this situation and I know very well it is most vital that we have this signature and this dower clause to protect them in the even that they are having difficulties with their husbands.
>
> [The husband] may alienate this property—not only the homestead, but any other land. He may have $1 million in stocks; but he may have it in apartments, he may have it in land, and the woman who maybe has helped him to acquire this will have no control and no strings whatsoever if they are having difficulty. Now, if there is no marital difficulty, the husband can readily get his wife's signature. If there is marital difficulty and the husband wishes to get rid of the wife and get rid of his property from her

---

[7] I offer evidence of policy-makers' debates about dower solely to gain insight into their genuine reasons for the gender-based classification in order to avoid justifications that are merely "hypothesized or invented *post hoc* in response to litigation." *VMI*, 518 US at 533 (1996); see also *post* at 33.

name and her control, it can be accomplished if you will adopt [the amendment abolishing dower.] [*Id.*][8]

In light of this discussion, the delegates ultimately decided that the Legislature was in the best position to gauge the need for dower, and the wisdom of retaining it, over time. *Id.* at 3151. Accordingly, although our 1963 constitution abolishes the disabilities associated with coverture, it does not abolish dower, but explicitly provides that "[d]ower may be relinquished or conveyed as provided by law." Const 1963, art 10, § 1.[9]

The Legislature affirmatively decided to retain dower in 1998 when it enacted EPIC in 1998 PA 386. EPIC was modeled on the Uniform Probate Code, which expressly abolished dower. See Uniform Probate Code, § 2-112, 8 ULA pt 1, p 90. The original Senate bill that proposed EPIC likewise abolished dower. 1997 SB 209, §§ 2112, 8102. But, in September 1998, the House of Representatives voted to retain dower and allow a widow to elect it, and the Senate adopted the House amendment. 1998 Journal of the House 2211; 1998 Journal of the Senate 1822-1823, 1830. The historical record provides scant information concerning legislators' reasons for retaining dower, but clearly they considered the ongoing merits of dower, and a majority of legislators concluded that it still served important objectives. Further, the Legislature continues to reevaluate the benefits of our dower scheme over time; HB 5587, introduced in 2007, would abolish dower and is just one of several bills introduced since 1999 that would amend the dower statutes.

In sum, it is beyond question that the historical right of dower continues to serve important objectives of the state of Michigan. Moreover, our Legislature is in the best position to evaluate the ongoing relevance of dower, which may be especially suitable in Michigan. As I discuss further below, economic disparity between the sexes remains pronounced in Michigan: among the 50 states, the District of Columbia, and Puerto Rico, Michigan is one of only eight states with a female-to-male earnings ratio of less than 72 percent, as compared to the national average of 77.3 percent.[10]

[8] Donnelly's comments, made in 1962, apply uncannily to the case before us, in which James Miltenberger transferred all his real property—his office and the marital home—shortly before his death and without obtaining Sharon Miltenberger's signature; he did so only after the couple began having marriage difficulties and planning to divorce. The property certainly would have been marital property subject to division during the divorce proceedings.

[9] Note that the delegates' Address to the People accompanying the new constitution does not comment on the retention of dower or the changes to art 10, § 1. 2 Official Record, Constitutional Convention 1961, pp 3355-3362.

[10] In 2006, the median national yearly income for full-time male workers was $42,210. The median income for full-time female workers was $32,649. Thus, nationally, the ratio of women's earnings compared to those of men was 77.3 percent. In Michigan, the

## B. SUBSTANTIAL RELATION TO ACHIEVEMENT OF OBJECTIVES

The documented evidence of economic disparity between men and women—and especially older men and women, who are more likely to suffer the loss of their spouses—bears directly on whether dower is substantially related to our Legislature's goals. Significantly, however, dower by its nature is not aimed broadly at remedying all economic disparity between the sexes. The dower scheme inherently excludes all unmarried men and women; as an element of the laws governing inheritance, dower relates only to surviving spouses' rights to each other's property. Accordingly, dower aims to protect needy spouses and provide a remedy for economic discrimination against women in one distinct arena: spousal property rights upon the death of a spouse. Thus, dower reflects disparities between widows and widowers by discriminating on the basis of gender only within a limited class of men and women: surviving spouses.[11] It is this population of surviving spouses that we must consider when asking whether dower is sufficiently suited to its goals to survive equal protection review.

I conclude that, although dower is both overinclusive and underinclusive in relation to the target classes of needy surviving spouses and widows who have suffered economic discrimination, it reflects genuine differences between men and women who have lost a spouse, including that (1) widows receive considerably less income than widowers, (2) women over the age of 65 are more likely to live in poverty than similarly aged men, (3) women have longer life expectancies and, therefore, need economic support for a longer period after the loss of a spouse's contributions to the family, (4) women have less overall earning power in Michigan, and (5) women—particularly those of past generations who may face widowhood in current times—may have relied on their inchoate dower rights during the course of their marriages. Because there are significant documented differences in the economic circumstances of widows and widowers, the use

---

median income for males was $47,329 and the median income for females was $33,748. Thus, the comparable earnings ratio of women compared to men in Michigan was 71.3 percent. Only five states have lower earnings ratios—Alabama, Louisiana, North Dakota, West Virginia, and Wyoming. Only two other states' ratios are less than 72 percent—Montana (71.5 percent) and Utah (71.4 percent). United States Census Bureau, *Income, Earnings, and Poverty Data From the 2006 American Community Survey* (2007), pp 13-14, available at <http://www.census.gov/prod/2007pubs/acs-08.pdf> (accessed July 21, 2008).

[11] The dissent similarly observes that, for dower to be upheld, Sharon Miltenberger must demonstrate a "gender-based difference within the narrow population" reached by the relevant statutes: surviving spouses. The gender-based distinction "must be justified by showing that gender is a valid proxy for need within this population." *Post* at 41.

of gender as a proxy for economic disadvantage among surviving spouses is substantially related to the goals of dower.

As the dissent observes, United States Census Bureau statistics show that, generally, the median income of married men is nearly double that of married women.[12] As previously noted, Michigan generally falls well behind the national average—and the averages of 44 states, the District of Columbia, and Puerto Rico—in wage-equality between the sexes.[13] The dissent also acknowledges that women over 65 are 71 percent more likely than similarly aged men to live in poverty.[14] The United States Social Security Administration confirms that women receive significantly less income than men upon retirement.[15] One reason that women are more likely to face poverty over the age

[12] *Post* at 40, citing a table in United States Census Bureau, Income, Marital Status—All Races 18 Years Old and Over by Median Income and Sex: 1974 to 2006, available at <http://www.census.gov/hhes/www/income/histinc/p13ar.html> (accessed June 16, 2008). Although surviving spouses are the relevant class receiving disparate treatment on the basis of gender, information concerning the economic status of all women is still relevant to the discussion. Potential widows are a subclass of both all women and married women. They are also commonly over 65. Further, a woman's income from work affects her pension and social security benefits upon retirement. Thus, economic comparisons of women to men, married women to married men, and men and women over 65 are relevant to describe the differences between potential widows and widowers as subclasses of these groups.

[13] See n 10 of this statement.

[14] *Post* at 35, citing Legal Momentum, Reading Between the Lines: Women's Poverty in the United States 2004 (2004), p 1. Government data compiled from the last comprehensive census (2000) confirms that 11.9 percent of women over 65, and only 7 percent of men over 65, lived in poverty. Women over 65 were also twice as likely as men over 65 to live alone. United States Census Bureau: *We the People, Women and Men in the United States* (2005), pp 7, 14, available at <http://www.census.gov/prod/2005pubs/censr-20.pdf> (accessed July 21, 2008).

[15] Women's Social Security benefits are lower than those of men and women's median income upon retirement from private pensions or annuities is less than one half of men's median income from such sources. Social Security Online, Press Office, Social Security is Important to Women, available at <http://www.ssa.gov/pressoffice/factsheets/women.htm> (accessed July 10, 2008); Social Security Online, Office of Policy Data, Income of the Population 55 or Older, 2004, available at <http://www.socialsecurity.gov/policy/docs/statcomps/income_pop55/> (accessed July 10, 2008).

The dissent also observes, however, "that men experience a greater proportional loss of income than women after losing a spouse[.]" *Post* at 37 n 39. I would note that, although a man may lose a higher *percentage* of his income upon the loss of a spouse, this is in

of 65 is longer life expectancy.[16]  In 2004, the average life expectancy for American women was 80.4 years, compared to 75.2 years for men.[17]  Accordingly, among the aging population most likely to become surviving spouses, gender correlates with economic need.

Further, women's longer life expectancies may underlie gender-based distinctions without offending equal protection.  Indeed, gender-based distinctions are subject to heightened equal protection review—and *not* to the strict scrutiny review applicable to distinctions on the basis of race—in part because men and women *on the whole* have physical differences.  Thus, although our "inherent differences" may not be employed "for denigration of the members of either sex or for artificial constraints on an individual's opportunity," sex is not "a proscribed classification."  *VMI,* 518 US at 533 (1996).  As the United States Supreme Court observed:

> The heightened review standard our precedent establishes does not make sex a proscribed classification. Supposed "inherent differences" are no longer accepted as a ground for race or national origin classifications. See *Loving* v. *Virginia,* 388 U.S. 1 (1967). Physical differences between men and women, however, are enduring: "[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both." *Ballard* v. *United States,* 329 U.S. 187, 193 (1946).  [*Id.*][18]

For these reasons, the distinction between widows and widowers does not rest on mere "archaic and stereotypic notions" or mere presumptions that women "suffer from an inherent handicap or [are] innately inferior . . . ."  *Mississippi Univ for Women v Hogan*,

---

part because his income was higher *to begin with*; he still earns significantly more in raw dollars after the death of a spouse than does a woman.  Using the statistics for 2005 cited by the dissent, *post* at 37 n 39, the average widower earns roughly double the very meager poverty threshold for Americans over 65 (which was $9,367 in 2005), whereas the average widow earns only about 1½ times the threshold amount.  United States Census Bureau, Poverty, Poverty Thresholds 2005, available at <http://www.census.gov/hhes/www/poverty/threshld/thresh05.html> (accessed July 10, 2008).

[16] *Social Security is Important to Women*, n 15, *supra*.

[17] Arias, United States Life Tables, 2004, 56 National Vital Statistics Reports, No. 9, p 4 (2007), available at <http://www.cdc.gov/nchs/data/nvsr/nvsr56/nvsr56_09.pdf> (accessed July 10, 2008).

[18] In the words of *Jenness v Fortson*, 403 US 431, 442 (1971):  "Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike . . . . "

458 US 718, 725 (1982). Rather, the direct evidence of economic disparity between these populations shows that the classification is rooted in accurate data and a "reasoned analysis," not "the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women," *id.* at 725-726, or "'overbroad generalizations about the different talents, capacities, or preferences of males and females,'" *Nevada Dep't of Human Resources v Hibbs,* 538 US 721, 729 (2003) (citation omitted). To use the words of the dissent, here a "palpable connection" clearly exists "between gender and the trait for which it serves as a proxy[.]" *Post* at 36.

### 1. *Califano v Webster*

United States Supreme Court precedent confirms that gender classifications are warranted in marital law and in the retirement context when the classifications remedy women's lower earnings in the past. Indeed, dower directly resembles the portion of the Social Security Act found to be constitutional in *Webster*, although the law discriminated between men and women. The law in *Webster* permitted women to exclude three more lower-earning years from the computation of their average wages—resulting in relatively higher benefits upon retirement—because women "have been unfairly hindered from earning as much as men . . . ." *Webster,* 430 US at 315-318. The resulting gender classification was constitutional because it "works directly to remedy some part of the effect of past discrimination." *Id.* at 318. Dower has a similar effect, because it assists in addressing women's lower incomes upon retirement, which are one result of lower earnings during women's working lives. Most significantly, like Michigan's dower scheme, the statute in *Webster* is both underinclusive of less wealthy male workers, who could not benefit from the additional three-year exclusion although they earned lower wages than other men, and overinclusive of more wealthy female workers who could make use of the exclusion although they may not have directly suffered from discrimination.

### 2. *Kahn v Shevin*

Next, in *Kahn v Shevin*, 416 US 351(1974), the United States Supreme Court expressly recognized the disparate financial effect on women who lose their spouses. Citing labor statistics similar to those cited above concerning economic and wage disparity between the sexes, the *Kahn* Court concluded that a Florida tax law granting a $500 property tax exemption to widows but not widowers permissibly "cushion[ed] the financial impact of spousal loss upon the sex for which that loss imposes a disproportionately heavy burden." *Id.* at 353-355. Thus, *Kahn* is directly relevant to the case before us and supports the conclusion that gender-based dower does not offend equal protection. Further, in her brief, Sharon Miltenberger makes the following compelling observation:

A woman of 65 now, one most likely to be in the class taking benefit of dower, was 34 when the statistics relied upon in the *Kahn* decision were recorded. The majority of today's widows were in their prime earning capacity years when women, even college educated women, earned far less than nearly any man. This deprived them not only of earnings at that time, but also the ability to accumulate wealth and property for the future.

Finally, like the statute in *Webster* and Michigan's dower scheme, the law upheld in *Kahn* is underinclusive of needy spouses because it does not address the needs of less wealthy widowers and overinclusive of widows because it does not exclude high-earning women.

The dissent essentially dismisses *Kahn,* opining that the Court employed rational basis review instead of heightened scrutiny. *Post* at 43. I do not think that *Kahn* may be so easily overlooked. *Kahn* was indeed decided before the United States Supreme Court established the modern test for intermediate scrutiny, which requires a gender classification to be "substantially related" to "important governmental objectives . . . ." *Craig,* 429 US at 197. Rational basis review merely requires a classification to be "rationally related to a legitimate governmental purpose." *Clark v Jeter*, 486 US 456, 461 (1988). *Kahn* upheld the law at issue by concluding that "Florida's differing treatment of widows and widowers ""'rest[s] upon some ground of difference having a fair and *substantial relation* to the object of the legislation."'" *Kahn,* 416 US at 355, quoting *Reed v Reed,* 404 US 71, 76 (1971) (emphasis added; citation omitted). Thus, the *Kahn* Court's conclusion appears to have been grounded in something more than a rational connection between the classification and a legitimate governmental purpose. Rather, the *Kahn* Court concluded that the classification bore a substantial relation to the goal of cushioning the effect of economic discrimination and disparity in income after the loss of a spouse, which the dissent agrees is an important governmental objective. And, as the dissent concedes, *Kahn* has not been overruled, *post* at 43, but is still good law. Accordingly, I conclude that *Kahn* remains persuasive here.[19]

The dissent also distinguishes *Kahn* because it "relied heavily on the fact that the provision at issue was a tax provision . . . ." *Post* at 43. The *Kahn* Court observed: "States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation" when "'taxation is concerned and no specific federal right, apart from equal protection, is imperiled . . . .'" *Kahn,* 416 US at 355 (citation omitted); *post* at 43. Because *Kahn* stated that leeway is afforded when taxation is concerned and no federal right *apart from equal protection* is involved, I cannot conclude that the Court's decision that the law comported with the Equal

---

[19] Moreover, as I explain below, the line between rational basis review and intermediate scrutiny review is not easily drawn, but is a source of much controversy.

Protection Clause arose merely or primarily from special deference to Florida's taxing power.

### 3. *Craig v Boren*

The dissent prefers to compare dower to the law found unconstitutional in *Craig*. But, for several significant reasons, I conclude that *Craig* does not require us to hold that Michigan's dower scheme violates the Equal Protection Clause. Indeed, as I discuss further in part III(C), the dissent's application of *Craig* would effectively render all gender classifications unconstitutional.

First, *Craig* is a problematic decision because although a majority of justices concurred in the result, only a plurality concurred in Justice Brennan's lead opinion. Justices Powell and Stevens each concurred, but explicitly condemned Justice Brennan's endorsement of a middle-tier analysis. *Craig,* 429 US at 210 (Powell, J., concurring); *id.* at 212 (Stevens, J., concurring). Justice Stewart similarly concurred in the result because he concluded the classification "amount[ed] to total irrationality . . . without even a colorably valid justification or explanation," and therefore the law constituted "invidious discrimination." *Id.* at 215 (Stewart, J., concurring in result). Chief Justice Burger and Justice Rehnquist dissented, rejecting the propriety of a middle-tier analysis, *id.* at 217 (Burger, C.J., dissenting); *id.* at 217-218 (Rehnquist, J., dissenting), and harshly criticizing Justice Brennan's attempts to justify his result by subjecting the state to "the judicial equivalent of a doctoral examination in statistics," *id.* at 221-226 (Rehnquist, J., dissenting).

Second, the goals and means of the statute at issue in *Craig* bore no resemblance to those of Michigan's dower scheme. The Oklahoma law permitting sales of 3.2 percent alcoholic beverages to women aged 18 years or older and men aged 21 years or older was ostensibly aimed at traffic safety.[20] *Craig,* 429 US at 199. Thus, the law was in no way aimed at remedying past discrimination between the sexes. Indeed, the *Craig* Court distinguished *Kahn* and *Schlesinger v Ballard,* 419 US 498 (1975), for that very reason. *Craig* noted that *Kahn* and *Schlesinger* "uph[eld] the use of gender-based classifications…[based] upon the Court's perception of the laudatory purposes of those laws as remedying disadvantageous conditions suffered by women in economic and military life." *Craig,* 429 US at 198 n 6. The Court then concluded: "Needless to say, in this case Oklahoma does not suggest that the age-sex differential was enacted to ensure the availability of 3.2% beer for women as compensation for previous deprivations."

---

[20] The Court strongly questioned whether traffic safety was the true goal of the statute, but accepted the state's claims for purposes of discussion. *Craig,* 429 US at 199-200 and n 7.

*Id.*[21] The law at issue in *Craig* also did not recognize a historic property right of women. Rather, for reasons unclear to the Court, the law precluded sales of certain alcohol to men under 21, when it could easily have precluded sales to all persons under 21.

Third, the statistics in *Craig* revealed a significantly less direct relationship between drunk driving and men aged 18 to 20 than the statistics here correlating widows and economic disadvantage as compared to widowers. The dissent relies on dicta and generalized statements in *Craig* regarding the "dubious[ness]" of "proving broad sociological propositions by statistics," and the less tenuous correlations in other cases that were nonetheless rejected as insufficient. *Post* at 36, quoting *Craig,* 429 US at 204. Indeed, I *agree* that the use of statistics "inevitably is in tension with the normative philosophy that underlies the Equal Protection Clause." *Post* at 36, quoting *Craig*, 429 US at 204. But, as *Craig* illustrates, unless we are to apply strict scrutiny or strike down all gender-based classifications, empirical data may be necessary to gauge whether there is a substantial relationship between such a classification and an important governmental objective. See part III (C) of this statement.

The actual statistics underlying the Court's holding in *Craig* are not comparable to the data relevant here. The *Craig* plurality did *not* find the statistics insufficient merely because 2 percent of men as compared to 0.18 percent of women were arrested for drunk driving. Rather, it concluded that these data represented the "most focused and relevant" of the statistics offered by the state, yet they did not justify the classification because, overall, the "statistics exhibit[ed] a variety of other shortcomings that seriously impugn[ed] their value to equal protection analysis." *Craig,* 429 US at 201-202. Most significantly, the statistical surveys did not "justify the salient features of Oklahoma's gender-based traffic-safety law" because "[n]one purport[ed] to measure the use and dangerousness of 3.2% beer as opposed to alcohol generally"; the Court found this detail to be "of particular importance since, in light of its low alcohol level, Oklahoma apparently consider[ed] the 3.2% beverage to be 'nonintoxicating.'" *Id.* at 202-203. The plurality added: "Moreover, many of the studies, while graphically documenting the unfortunate increase in driving while under the influence of alcohol, ma[de] no effort to relate their findings to age-sex differentials as involved here." *Id.* at 203. Indeed, Justice Brennan noted that roadside surveys had established that "'the under-20 age group generally showed a lower involvement with alcohol in terms of having drunk within the past two hours or having a significant BAC (blood alcohol content).'" *Id.* at 203 n 16 (citation omitted). Thus, the surveys "provide[d] little support for a gender line among

---

[21] In dissent, Justice Rehnquist similarly observed: "Most obviously unavailable to support any kind of special scrutiny in this case, is a history or pattern of past discrimination . . . . " *Craig,* 429 US at 219 (Rehnquist, J., dissenting). "There is no suggestion in the Court's opinion that males in this age group are in any way peculiarly disadvantaged, subject to systematic discriminatory treatment, or otherwise in need of special solicitude from the courts." *Id.*

teenagers and actually r[an] counter to the imposition of drinking restrictions based upon age." *Id.*

In contrast, as explained above, although gender-based dower is somewhat over- and underinclusive of its goals, there is a clear correlation between widows and economic need, as well as past economic discrimination. The correlation rests on more than the mere "loose-fitting generalities concerning the drinking tendencies of aggregate groups" presented in *Craig*. *Craig,* 429 US at 209. Further, the law at issue in *Craig* discriminated against men to serve the general goal of traffic safety, which is unrelated to gender in substance. But here, dower's gender classification is expressly aimed at remedying gender disparities.

### 4. *Orr v Orr*

Perhaps most significantly, Michigan's dower scheme is distinguishable from the laws compared by the dissent because those laws are amenable to gender-neutral application. The dissent compares cases in which the United States Supreme Court "has held that using gender as a proxy for need is unwarranted when nondiscriminatory means of determining need are equally available." *Post* at 38. It relies on *Orr v Orr*, 440 US 268 (1979). But *Orr* is distinguishable for significant reasons that exemplify the differences between the case before us and the cases on which the dissent relies. The statute in *Orr,* which allowed for women but not men to receive alimony upon divorce, similarly sought to assist needy spouses and compensate for past discrimination. *Id.* at 280. But, crucially, the statute in *Orr* provided for individualized hearings at which both spouses' financial circumstances were examined. *Id.* at 281. Accordingly, the gender-based distinction was gratuitous; the hearings would allow similarly situated individuals to be treated the same with little if any additional burden on the state, and the effort to aid disadvantaged women "would not in any way be compromised." *Id.* at 281-282. Thus, the state's "compensatory and ameliorative purposes [were] as well served by a gender-neutral classification as one that gender classifies . . . ." *Id.* at 283.

In contrast, probate proceedings under Michigan's EPIC provide no such mechanism to determine financial need. I respectfully suggest that the dissent is too cavalier in suggesting that "nondiscriminatory methods" such as gender-neutral dower or "[d]ower provisions that apply to those spouses who demonstrate an actual need for dower" would serve the goals of dower "equally well, if not better." *Post* at 39. While I concur that the Legislature would do well to establish a nondiscriminatory solution, as other states have done, the Legislature alone can determine the feasibility of such a solution in Michigan. At this time, individualized hearings such as those suggested by the dissent do *not* exist. As I will explain below, I also question the feasibility of creating a gender-neutral dower scheme that is consistent with existing property rights in Michigan. Accordingly, I do not think that *Orr* is controlling.

5. *Wengler v Druggists Mut Ins Co, Califano v Golfarb,* and *Weinberger v Wiesenfeld*

Other cases on which the dissent relies involved laws with similarly available means for gender-neutral application. In *Wengler v Druggists Mut Ins Co,* 446 US 142, 151 (1980), widowers but not widows were required to prove dependence on a spouse's earnings before receiving workers' compensation death benefits. The Court concluded that administrative convenience did not justify discrimination when benefits could be made available either to all applicants regardless of sex or to both men and women who proved dependence. *Id*. at 151-152. *Califano v Goldfarb*, 430 US 199 (1977), addressed federal old-age, survivors, and disability insurance benefits automatically payable to widows, but payable to widowers only upon proof of dependency. Significantly, not only was a method for proving dependency already in place, but the Court centrally held that the law violated equal protection because it was *not* aimed at compensating for need or discrimination, but "reflect[ed] only a presumption that [women] are ordinarily dependent" and denigrated women's wage earnings. *Id*. at 214. Finally, the dissent cites *Weinberger v Wiesenfeld*, 420 US 636 (1975), for the proposition that distinctions "not entirely without empirical support" nonetheless may not meet equal protection standards. *Post* at 36, quoting *Weinberger,* 420 US at 645. *Weinberger* is relevant to the extent that dower may offend equal protection by denigrating women's work and earnings, *id*. at 645, as I discuss below. But, as in *Wengler*, the Court did not hold the Social Security Act benefits scheme at issue in *Weinberger* unconstitutional because it employed gender as an imperfect proxy for need. To the contrary, the Court concluded that benefits available automatically only to widows *with children* were not designed to remedy economic discrimination; rather, the classifications were "intended to permit women to elect not to work and to devote themselves to the care of children." *Id*. at 648. The Court concluded: "Since this purpose in no way is premised upon any special disadvantages of women, it cannot serve to justify a gender-based distinction which diminishes the protection afforded to women who do work." *Id.*

6. *The "substantial relation" test applied to this case*

The dissent stresses that dower is underinclusive even with regard to economically disadvantaged widows and overinclusive with regard to widows who do not face financial difficulty. These points are well-taken. But dower is not *unconstitutional* merely because it is imperfect. First, although dower may apply only in limited circumstances, those circumstances are meaningful. As the dissent notes, "'[s]ince a surviving spouse generally takes a dower or curtesy interest free from debts, these interests may offer more protection than other spousal protection provisions.'" *Post* at 32, quoting 15 Powell, Real Property, § 85.20[2][c], p 379. Significantly, dower also normally attaches to the marital home.[22] Further, dower is not available on a purely

---

[22] The particular importance of a woman's use of her marital home after her husband's death was explicitly raised at the 1961 constitutional convention. Indeed, the delegates

random basis. Rather, it is a viable option *only if* a husband transfers real property *without his wife's consent*, see MCL 558.13, and *also* leaves a minimal estate; in other words, it is available in cases such as this one, in which Sharon Miltenberger's husband transferred the marital home and his office without her consent shortly before his death and left an estate with a net worth of only $8,823.06. Finally, dower is only available *from* transferees who received the property with notice that it was subject to a wife's dower rights; presumably, if the property is purchased, the wife's contingent rights are reflected in a lower purchase price. Thus, although dower may become available in rare circumstances to a widow who is not economically advantaged, the grantee is not unjustly caught unaware of her potential claim.

Dower is also underinclusive in the sense that it does not benefit the statistically smaller group of needy widowers. But dower does not denigrate women's earnings, as did the laws at issue in *Wengler, Goldfarb,* and *Weinberger.* The dissent asserts that "[p]recluding men from asserting a dower right in their wife's lands provides female landowners fewer protections than male landowners." *Post* at 43. But what prevents a woman from selling her land for a lower price in order to provide her husband a contingent 1/3 remainder during the course of his life? Indeed, because any landowner has such an option, dower appears *primarily* applicable to cases like this one, in which a spouse explicitly sought to shield his wealth from his mate, who may have relied on her dower right. In contrast, *Goldfarb, Wengler,* and *Weinberger* involved disparate treatment of women in *public* schemes that directly devalued their earnings and for which they had no private remedy.[23] The gender-based distinction in the federal program addressed by *Goldfarb*, which paid benefits to widows automatically but to widowers only upon proof of dependency, "result[ed] in the efforts of female workers required to pay social security taxes producing less protection for their spouses than is produced by the efforts of men . . . ." *Goldfarb,* 430 US at 206-207. The workers' compensation scheme in *Wengler* similarly allowed automatic benefits for widows, but not for widowers, without regard to a deceased wife's past work and earnings. *Wengler,* 446 US at 151. In *Weinberger,* the Court explicitly observed that although "the notion that men are more likely than women to be the primary supporters of their spouses and children is not entirely without empirical support," the social security taxes at issue

---

considered eliminating dower "except as to the homestead." 2 Official Record, Constitutional Convention 1961, pp 2444-2445.

[23] *Craig* is similarly distinguishable. There the classification resulted in a detriment to males aged 18 to 20 who had no option to buy 3.2 percent alcohol upon proof that they never drove while under the influence of alcohol. Yet a husband may solicit his wife's signature to ensure that her dower rights are extinguished when he wishes to transfer land.

were deducted from [the wife's] salary during the years in which she worked. Thus, she not only failed to receive for her family the same protection which a similarly situated male worker would have received [because only widows with children automatically received death benefits], but she also was deprived of a portion of her own earnings in order to contribute to the fund out of which benefits would be paid to others. [*Weinberger,* 420 US at 645.]

In sum, dower is not a perfect proxy for need or a complete remedy for past discrimination even within the relevant population of surviving spouses. But dower is not as imperfect—or as easily replaced—as the dissent suggests. Although we may not *like* the current state of affairs in which women—and widows in particular—are economically disadvantaged as a result of discrimination or of arguably outdated gender-based family roles, the data show that dower is *not* based on mere "'assumptions as to dependency'" inconsistent with "contemporary reality." *Goldfarb,* 430 US at 207 (citations omitted); *post* at 34-35. Dower also imposes no particular harm on women landowners who are not economically disadvantaged, because they may contractually protect their husbands. Similarly, landowning men may remove the burden of dower from their transactions simply by soliciting their wives' signatures. Retaining dower also protects the choices of women who have historically relied on its existence while taking time off from work to raise children or maintain their homes.

Most significantly, dower serves important, constitutionally sound governmental objectives that are *not* equally served by hypothetical gender-neutral schemes without additional burdens on the state. Unlike the gender-neutral schemes available in *Orr* and *Goldfarb,* gender-based dower cannot be eliminated without compromising the effort to aid disadvantaged women. See *Orr,* 440 US at 282. The gender distinction here is not "gratuitous." See *Weinberger,* 420 US at 653. I would wholeheartedly support laws that provide "more direct means of reallocating income or other personal wealth" than "providing a life estate in a portion of lands owned by a woman's husband[.]" *Post* at 42. But this Court cannot direct the Legislature to create complex social support regimes out of thin air. Indeed, I am not convinced that the Legislature could feasibly adopt a gender-neutral dower scheme, as the dissent suggests. *Post* at 39. First, no mechanism exists to determine whether a spouse is sufficiently dependent to justify a dower right in property owned by a third party. Most significantly, gender-neutral dower for husbands in land already transferred would compromise vested property rights; although a woman's right to dower has always been embedded in Michigan law pertaining to real property, a man's right to dower has never been recognized or taken into account during past transactions involving real property.

For these reasons, I conclude that the dissent wrongly equates the shortcomings of dower with its unconstitutionality. There is undeniable evidence that widows are

economically disadvantaged as compared to widowers, *particularly in Michigan.* Because dower does not denigrate women, and because no system of social welfare or remedy for past discrimination can achieve complete success, I conclude that the gender distinction inherent in Michigan's dower statutes is sufficiently related to the goals of dower to withstand equal protection scrutiny.

## C. THE CONTOURS OF INTERMEDIATE SCRUTINY

The dissent accuses me of engaging in rational basis review. *Post* at 45. I, in turn, conclude that the dissent's formulation of intermediate scrutiny amounts to strict scrutiny and would invalidate most, if not all, conceivable gender-based classifications. Overall, absent further guidance from the United States Supreme Court concerning implementation of the intermediate scrutiny standard, I would not invalidate our Legislature's recent choice to retain dower as a remedy for past economic discrimination and aid some number of impoverished widows while preventing them from becoming public charges. Although dower appears to reflect stereotypes, it is also rooted in documented differences in circumstances between the sexes.

"The heightened review standard . . . does not make sex a proscribed classification." *VMI,* 518 US at 533. The law may recognize our differences as long as it does not do so to "denigrat[e] . . . the members of either sex" or to create "artificial constraints on an individual's opportunity." *Id.* Moreover, remedying past discrimination against women is explicitly recognized as an important governmental objective. *Id.*; *Webster,* 430 US at 317. Thus, evidence of real-world disparities between men and women or discrimination on which a challenged statute is premised is both relevant and necessary to intermediate scrutiny.

Yet, as my debate with the dissent illustrates, courts are at a loss about how to employ such evidence in practice. As noted, the *Craig* Court itself engaged in a debate about the appropriateness and workability of intermediate scrutiny. Tellingly, in his dissent, Justice Rehnquist remarked that use of the substantial relation test "requires courts to make subjective judgments as to operational effects, for which neither their expertise nor their access to data fits them." *Craig,* 429 US at 221. Courts commonly use statistics when applying the intermediate scrutiny standard.[24] But the divisive

---

[24] See, e.g., *Hogan,* 458 US at 729 n 14 (citing, among other things, national statistics published by the United States Census Bureau regarding the percentage of nursing degrees conferred on women as compared to men); *Craig,* 429 US at 201-203, and the discussion in III(B)(3) of this statement; and *Kahn,* 416 US at 353-354 and n 7 (citing, among other things, national statistics published by the United States Census Bureau and the Women's Bureau of the United States Department of Labor regarding income disparity between the sexes).

question remains: How much and what kind of empirical support is sufficient to justify the classification?

The United States Court of Appeals for the Third Circuit attempted to answer this question in *Contractors Ass'n of Eastern Pennsylvania, Inc v Philadelphia,* 6 F3d 990 (CA 3, 1993), a so-called "affirmative action" case involving a city contracting program that gave preferential treatment to enterprises owned by racial and ethnic minorities, women, and handicapped persons. With regard to the preference in favor of women, the court observed:

> Few cases have considered the evidentiary burden needed to satisfy intermediate scrutiny in this context . . . . In particular, it is unclear whether statistical evidence as well as anecdotal evidence is required to establish the discrimination necessary to satisfy intermediate scrutiny, and if so, how much statistical evidence is necessary. The Supreme Court gender-preference cases are inconclusive. The Court has never squarely ruled on the necessity of statistical evidence of gender discrimination. And its decisions are difficult to reconcile on the point. The Court has upheld gender preferences where no statistics were offered, *Schlesinger . . . ,* 419 U.S. 498, 508-09 . . . (preferential employment treatment for women military officers), struck down gender preferences despite the presence of statistics, *Craig . . . ,* 429 U.S. 190, 203-04 . . . (statute allowing 18 year old women but only 21 year old men to purchase 3.2% beer), *Weinberger . . . ,* 420 U.S. 636 . . . (statute allowing survivors' benefits for widows but not widowers), and also decided cases both ways by relying in part on statistics, *Hogan,* 458 U.S. at 728 . . . (striking down female-only nursing school), . . . *Webster,* 430 U.S. 313, 318 & n. 5 . . . (upholding federal statute allowing women to eliminate more low-earning years from calculation of their retirement benefits than men). [*Id.* at 1010.]

The Third Circuit ultimately concluded that the city was required "to present probative evidence in support of its stated rationale for the gender preference," relying on the Supreme Court's statement "that an affirmative action program survives intermediate scrutiny if the proponent can show it was 'a product of analysis rather than a stereotyped reaction based on habit.'" *Id.,* citing *Metro Broadcasting, Inc v FCC,* 497 US 547, 582-583 (1990).[25]

---

[25] The Third Circuit held that the city had not met this burden because it provided no "probative statistical evidence" and its anecdotal evidence consisted only of one three-page affidavit alleging discrimination and one "conclusory sentence" from a witness who attended a city council meeting. *Contractors Ass'n,* 6 F3d at 1011. With regard to the city's statistics, the court observed: "[T]he City relies on statistics in the City Council Finance Committee Report and one affidavit from a woman engaged in the catering

The Eleventh Circuit helpfully refined the Third Circuit's test in *Engineering Contractors Ass'n of South Florida, Inc v Metropolitan Dade Co,* 122 F3d 895 (CA 11, 1997). There, addressing a similar law aimed at remedying discrimination against women, the court opined:

> Although it is clear that both gender-conscious and race- or ethnicity-conscious programs must be tested for evidentiary sufficiency, the measure of the evidence required is less clear in the gender context. The Supreme Court has not addressed the question explicitly, and there is a similar dearth of guidance in the reported decisions of other federal appellate courts. . . . The Supreme Court has told us plainly that race- and ethnicity-conscious programs must be tested for a "strong basis in evidence," and a body of appellate jurisprudence has developed to provide that label with meaningful content. *See, e.g.,* [*City of Richmond v JA Croson Co*, 488 US 469, 499-504 (1989)] (identifying factors that cannot form a "strong basis in evidence"); [*Ensley Branch, NAACP v Seibels,* 31 F3d 1548, 1565 (CA 11, 1994)] (citing and applying *Croson*). In the gender context, however, we must work without an analogous evidentiary label from the Supreme Court, and the jurisprudence is less developed.

> Regardless of what label might be affixed to the standard, it is clear to us that a gender-conscious affirmative action program can rest safely on something less than the "strong basis in evidence" required to bear the weight of a race- or ethnicity-conscious program. We agree with the Third Circuit that "[l]ogically, a [local government] must be able to rely on less evidence in enacting a gender preference than a racial preference because applying *Croson*'s evidentiary standard to a gender preference would eviscerate the difference between strict and intermediate scrutiny." *Contractors Ass'n,* 6 F.3d at 1010; *see also* Peter Lurie, Comment, *The Law as They Found It: Disentangling Gender-Based Affirmative Action Programs from Croson,* 59 U. Chi. L.Rev. 1563, 1584-89 (1992) (concluding that "[t]he factual predicate required cannot be equal to that needed to support a racial classification" because "[a]ppending a *Croson*-style factual predicate to the standard disingenuously transforms" intermediate scrutiny into strict scrutiny).

---

business, but this evidence only reflects the participation of women in City contracting generally, rather than in the construction industry, which is the only cognizable issue here." *Id.* at 1010-1011. The court also noted that a study provided by the city "contain[ed] no disparity index for women-owned construction businesses in City contracting, such as that presented for minority-owned businesses." *Id.* at 1011. Accordingly, the city's evidence was "insufficient to create an issue of fact." *Id.*

> While there is a difference between the evidentiary foundation necessary to support a race- or ethnicity-conscious affirmative action program and the evidentiary foundation necessary to support a gender preference, that difference is one of degree, not of kind. In both circumstances, the test of the program is the adequacy of evidence of discrimination, but in the gender context less evidence is required. The difficulty, of course, is in determining how much less. [*Id.* at 909.]

The Eleventh Circuit proceeded to examine the "probative evidence" standard enunciated by the Third Circuit in *Contractors Ass'n.* The Court approved of the standard as applied, explaining:

> Plainly, the evidence offered by the government in *Contractors Association* was "probative" as that word is commonly understood, because it tended, at least to some extent, to prove discrimination against women. . . . The probative evidence in *Contractors Association* was nonetheless judged "insufficient." We think that the court's *holding* in *Contractor's Association* is more helpful than the "probative evidence" standard the opinion articulates. Under the Third Circuit's *holding,* evidence offered in support of a gender preference must not only be "probative," it must also be "sufficient." [*Id.* at 909-910.]

In attempting to circumscribe this "sufficient probative evidence" standard, the court analogized and contrasted the stricter "strong basis in evidence" standard applicable to race-based classifications. It focused on "two principal guidelines that mark the boundaries of intermediate scrutiny evidentiary analysis." *Id.* at 910.

> First, "[u]nder the intermediate scrutiny test, a local government must demonstrate some past discrimination against women, but not necessarily discrimination by the government itself." *Ensley Branch,* 31 F.3d at 1580. Indeed, "[o]ne of the distinguishing features of intermediate scrutiny is that, unlike strict scrutiny, the government interest prong of the inquiry can be satisfied by a showing of societal discrimination in the relevant economic sector." *Id.* (citations omitted). Thus, to be sufficient the evidence need not be about governmental discrimination.

> Second, the intermediate scrutiny evidentiary review is not to be directed toward mandating that gender-conscious affirmative action is used only as a "last resort," *Hayes v. North State Law Enforcement Officers Ass'n,* 10 F.3d 207, 217 (4th Cir. 1993) (racial discrimination case), but instead to ensuring that the affirmative action program is "a product of analysis rather than a stereotyped reaction based on habit," *Contractors Ass'n,* 6 F.3d at 1010 (quoting *Metro Broadcasting,* [497 US at 582-583]).

> Nevertheless, any "'analysis' that rests upon unsupported factual premises cannot possibly be 'reasoned,' and an untrue and widely-held generalization about men or women is by definition a 'stereotype.'" *Lamprecht v. FCC,* 958 F.2d 382, 393 n. 3 (D.C.Cir.1992) (Thomas, Circuit Justice). That is why the intermediate scrutiny evidentiary "inquiry turns on whether there is evidence of past discrimination in the economic sphere at which the affirmative action program is directed." *Ensley Branch,* 31 F.3d at 1581. Unsupported generalizations will not suffice. [*Id.*]

The Eleventh Circuit concluded: "Under those guidelines, the government must satisfy an 'intermediate' standard—less stringent than the 'strong basis in evidence' standard associated with strict scrutiny, yet more demanding than merely any probative evidence." *Id.*[26]

As applied here, Sharon Miltenberger presented data showing both wage disparities between the sexes and the relative poverty of men and women over 65. She addressed both the national and local economic spheres, as well as wage disparities among the married population capable of becoming surviving spouses. With regard to the closeness of "fit" between dower's means and its capability of remedying these disparities, I conclude that she also showed that dower is "a product of analysis rather than a stereotyped reaction based on habit." *Metro Broadcasting,* 497 US at 582-583. As the Eleventh Circuit acknowledged, the meaning of "sufficient," even in reference to this standard, "may elude precise formulation . . . ." *Engineering Contractors Ass'n,* 122 F3d at 910. But *Hogan* provided crucial guidance on this point by explaining the *purpose* of the substantial relation test: "The purpose of requiring that close relationship is to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women." *Hogan,* 458 US at 725-726.[27] Thus—in keeping with the *Craig* Court's concerns about the "dubious[ness]" of "proving broad sociological proposition by statistics," *Craig,* 429 US at 204 (Brennan, J.), and the unworkability of a test that "requires courts to make subjective judgments as to operational effects, for which neither their expertise nor their access to data fits them," *id.* at 221 (Rehnquist, J., dissenting)—*Hogan* suggests that the sufficiency or "fit" of the data is judged not by whether a law's proponent can meet some numerical threshold, but by whether the data reflect permissible goals rooted in true differences. If, as here, the data reflect true differences and the law provides some degree of remedy for the resulting disparities, the law's proponent has shown that the law is constitutional because it is not based on mere

---

[26] Compare the Tenth Circuit's similar observations in *Concrete Works of Colorado, Inc v City & Co of Denver,* 321 F3d 950, 959-960 (CA 10, 2003).

[27] A gender-based classification will not be upheld if its objective is "to exclude or 'protect' members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior . . . ." *Hogan,* 458 US at 725.

reflexive assumptions that denigrate the sexes. Put otherwise, the law is constitutional because it does not rely on "unsupported factual premises," and, since strict scrutiny does not apply, the law need not be justified as a "last resort" or have a "*strong* basis in evidence." See *Engineering Contractors Ass'n,* 122 F3d at 910 (emphasis added). These conclusions are practically required if we are to distinguish strict scrutiny from intermediate scrutiny while honoring the current, somewhat conflicting body of equal protection jurisprudence.

Finally, the dissent relies heavily on the United States Supreme Court's reluctance to uphold gender classifications in the realm of marital law. *Post* at 30-31, 46. I offer two responses. First, as previously discussed, the cases cited by the dissent are generally distinguishable, because they involve public schemes that directly denigrate women's earnings or because the laws involved were amenable to gender-neutral alternatives, or both. Second, I cede the dissent's point to a large degree, but with a caveat. The dissent's assertion that I "equate[] strict scrutiny with the intermediate scrutiny that [Justice Cavanagh] employ[s] in this case," *post* at 46, illustrates my point that the Supreme Court's intermediate scrutiny jurisprudence is inconsistent and difficult to apply. Justice Cavanagh's analysis resembles strict scrutiny in part because the Supreme Court's analyses resemble strict scrutiny, particularly in the post-*Kahn* marital arena. In *Engineering Contractors Ass'n*, the Eleventh Circuit addressed this very issue as a problem existing across the board in intermediate scrutiny cases. The court began by noting the Supreme Court's use throughout its *VMI* opinion—which invalidated maintenance of a single-sex education program at the Virginia Military Institute—of the phrase "exceedingly persuasive justification" to describe the substantial relation test. *Engineering Contractors Ass'n,* 122 F3d at 907. The Eleventh Circuit opined that the phrase "connotes more intense scrutiny than do customary descriptions of intermediate scrutiny," citing Justice Scalia's dissent in *VMI. Id.* Indeed, in *VMI*, Justice Scalia accused the high court of effectively adopting the strict scrutiny test for gender classifications. *VMI,* 518 US at 571 (Scalia, J., dissenting). Yet the *VMI* majority disclaimed doing so, *id.* at 532, and, in concurring in the result, Chief Justice Rehnquist explicitly counseled:

> While terms like "important governmental objective" and "substantially related" are hardly models of precision, they have more content and specificity than does the phrase "exceedingly persuasive justification." That phrase is best confined, as it was first used, as an observation on the difficulty of meeting the applicable test, not as a formulation of the test itself. [*Id.* at 559 (Rehnquist, C.J., concurring in result).]

Accordingly, the Eleventh Circuit declined to apply a new, stricter standard in cases addressing gender-based classifications, stating: "Unless and until the Supreme Court tells us otherwise, intermediate scrutiny remains the applicable constitutional standard in

gender discrimination cases, and a gender preference may be upheld so long as it is substantially related to an important governmental objective." *Engineering Contractors Ass'n,* 122 F3d at 908. I similarly conclude that, although "[i]t is unfortunate that the Court [has] introduce[d] an element of uncertainty respecting the appropriate test" in cases involving gender-based classifications, *VMI,* 518 US at 559 (Rehnquist, C.J., concurring in result), the Supreme Court's formally enunciated test remains: Is the classification substantially related to an important governmental objective? Unless and until the Court says otherwise, I believe that we are bound to uphold our Legislature's choice to retain dower, because it passes the substantial relation test and also may reasonably be distinguished from the cases involving marital laws cited by the dissent.

IV. CONCLUSION: THE UNIQUE STATUS OF DOWER IN MICHIGAN

I close by directly addressing the dissent's opening question: "whether Michigan alone among the 50 states may continue to confer a dower right on women, without offering a corresponding right to men." *Post* at 27-28. In answering "Yes," I have already explained that Michigan women have historically relied on dower and that Michigan falls well behind the national average for wage-equality between the sexes.[28]

I also note that Michigan courts join courts throughout the nation in employing a strong presumption of constitutionality in favor of a legislature's acts. As we observed in *Sears v Cottrell,* 5 Mich 251, 259 (1858):

> No rule of construction is better settled in this country, both upon principle and authority, than that the acts of a state legislature are to be presumed constitutional until the contrary is shown; and it is only when they *manifestly* infringe some provision of the constitution that they can be declared void for that reason. In cases of doubt, every possible presumption, not clearly inconsistent with the language and the subject matter, is to be made in favor of the constitutionality of the act.

As the judicial branch of government, "[w]e are duty bound under the Michigan Constitution to preserve the laws of this state . . . ." *People v Bricker,* 389 Mich 524, 528 (1973). Accordingly, "[w]e exercise the power to declare a law unconstitutional with extreme caution, and we never exercise it where serious doubt exists with regard to the conflict." *Phillips v Mirac, Inc,* 470 Mich 415, 422 (2004). Indeed, as the dissent acknowledges, "declaring a statute unconstitutional is '"the gravest and most delicate duty that this Court is called on to perform"' . . . ." *People v Lynch,* 410 Mich 343, 352 (1981), quoting *United States v Raines*, 362 US 17, 20 (1960), in turn quoting *Blodgett v Holden*, 275 US 142, 148 (1927) (Holmes, J.). See *post* at 28.

---

[28] See n 10 of this statement.

To this end, I would also note that Michigan is not alone in concluding that dower is constitutional. Courts in Utah and Florida upheld dower in response to claims that it violated equal protection, albeit before the intermediate scrutiny standard of review was established for gender-based classifications. *In re Baer Estate,* 562 P2d 614 (Utah, 1977), app dis for want of a substantial federal question 434 US 805 (1977);[29] *In re Rincon Estate,* 327 So 2d 224 (Fla, 1976).[30] Moreover, the fact our sister states have since amended their dower laws, *post* at 28 n 31, does not render such laws *unconstitutional.* Although Michigan alone continues to confer a dower right on widows only, the nationwide consensus or polling approach to applying the mandates of the Fourteenth Amendment has been criticized for good reason.

United States Supreme Court Justice Harlan counseled that, when courts endeavor to "ascertain those 'immutable principles . . . of free government which no member of the Union may disregard,'" they must do so by examining the constitutional language and maintaining "due recognition of constitutional tolerance for state experimentation and disparity . . . ." *Duncan v Louisiana,* 391 US 145, 176 (1968) (Harlan, J., dissenting), quoting *Holden v Hardy*, 169 US 366, 389 (1898). He observed that the "'Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two States separated only by an imaginary line.'" *Duncan*, 391 US at 177, quoting *Missouri v Lewis*, 101 US 22, 31 (1879). Thus, the Fourteenth Amendment does not "impose nationwide uniformity in details . . . ." *Duncan*, 391 US at 177. Chief Justice Burger offered a similar observation in *Baldwin v New York,* 399 US 66, 77 (1970) (Burger, C.J., dissenting), quoting the *Baldwin* majority: "That the 'near-uniform judgment of the Nation' is otherwise than the judgment in some of its parts affords no basis for me to read into the Constitution something not found there." Finally, in his compelling dissent in *New State Ice Co v Liebmann,* 285 US 262, 311 (1932), Justice Brandeis cautioned:

---

[29] In *Baer Estate,* 562 P2d at 616, the Utah Supreme Court noted "a presumption of constitutionality of legislative enactments" and concluded that the "Utah statute serves a policy of long standing which cushions the financial impact of spousal loss upon the sex for which that loss imposes a disproportionately heavy burden," citing *Kahn.*

[30] In *Rincon Estate,* 327 So 2d at 226, the Florida Supreme Court concluded that "where a statute's differing treatment of widows and widowers rests on some ground of reasonable difference having a fair and substantial relation to the object of the legislation, that statute does not violate the equal protection clauses of our statute and federal constitutions." The court also noted that the "drafters of the 1968 [Florida] Constitution intended to vest authority in the Legislature to make a distinction between the sexes with respect to providing rights of a wife in the property of her husband without requiring that the husband be granted reciprocal rights" because the constitution provided that "'dower *or* curtesy may be established and regulated by law.'" *Id.*

> To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country. This Court has the power to prevent an experiment. . . . But in the exercise of this high power, we must be ever on our guard, lest we erect our prejudices into legal principles. If we would guide by the light of reason, we must let our minds be bold.

Perhaps most tellingly, he added: "The remedy might bring evils worse than the present disease." *Id*. at 309. Although other states have chosen not to retain gender-based dower laws, nothing in the constitution prohibits Michigan from doing so. Rather than being *novel* or a new *experiment*, dower has *become* unique to Michigan, but this does not mean that it has become unconstitutional. Our Legislature made an explicit contemporary decision to defy the norm by retaining dower even though the nationwide Uniform Probate Code, on which our EPIC is modeled, abolishes dower. I would uphold our Legislature's conclusion that our age-old dower scheme still serves an important governmental objective and remains necessary in the economic and social climate of *our* state.

In sum: Yes, Michigan may continue to confer a dower right on women even if it is the only state to do so. Although imperfect, the dower scheme is substantially related to the particular economic disadvantages suffered disproportionately by widows in Michigan. Its substantial relationship to these real-world differences between male and female surviving spouses confirms that dower is not merely rooted in archaic stereotypes. Finally, dower is distinguishable from the laws cited by the dissent because dower does not denigrate women or devalue their earnings. Moreover, no existing nondiscriminatory process can provide widows with similar protection. Accordingly, in my view, our Court would not be constitutionally justified in depriving the Legislature of dower as a unique tool providing a minimum level of security for widows.

WEAVER, J., joins the statement of CORRIGAN, J.

CAVANAGH, J., dissents and states as follows:

I respectfully disagree with the majority's determination that the question presented in this case should not be reviewed by this Court. Respondent raises an equal protection challenge to two Michigan statutes that establish a widow's right to dower while denying the same benefits to widowers. In my estimation of the United States Supreme Court's modern constitutional jurisprudence, this statutory scheme's use of a gender-based classification violates the Equal Protection Clause of the United States Constitution. The question presented is jurisprudentially significant, as it asks whether

Michigan alone among the 50 states may continue to confer a dower right on women, without offering a corresponding right to men.[31] I believe that this Court should issue an opinion on the merits to resolve this matter.

Petitioner Sharon Miltenberger was married to James Miltenberger when he died in January 2004. However, she had filed for divorce in October 2003 and had moved out of the marital residence. In November 2003, while the divorce was pending, James Miltenberger quitclaimed two parcels of land to respondent Sandra Swartz, his daughter from a previous marriage. James Miltenberger had been the legal titleholder of the two parcels, which contained buildings that had been used as his office and the marital residence. James Miltenberger executed a will in January 2004 that devised his entire estate to Swartz, leaving his two other children and his wife nothing; he died on January 18, 2004. Sharon Miltenberger (hereafter "Miltenberger") petitioned for probate and the appointment of a personal representative. Probate proceedings determined that the value of the estate's assets totaled $16,745.48, but after subtracting expenses, the balance was $8,823.06. The parcels conveyed by James Miltenberger were not included in the inventory of the estate. Miltenberger filed a petition to make a late election to take her dower right under MCL 700.2202(2) and MCL 558.1. Swartz moved for summary disposition, seeking, in relevant part, to dismiss the petition as untimely and as unconstitutional on the ground that permitting a widow to make a dower election would violate the equal protection clauses of the Michigan and United States constitutions. The probate court permitted Miltenberger to elect to take her dower right, concluding that the dower election was neither untimely nor unconstitutional, and denied Swartz's motion for summary disposition. Swartz appealed on the constitutional ground, and the Court of Appeals affirmed the probate court's decision in a published opinion. *In re Miltenberger Estate*, 275 Mich App 47 (2007).

As a preface to considering the constitutionality of Michigan's dower statutes, I recognize that it is a matter of considerable consequence for a judge to strike down an enactment of the Legislature. "[D]eclaring a statute unconstitutional is the gravest and most delicate duty that this Court is called on to perform." *People v Lynch*, 410 Mich 343, 352 (1981) (citations and quotation marks omitted). However, with regard to the meaning of the United States Constitution, the decisions of the United States Supreme Court are controlling. *Cooper v Aaron*, 358 US 1, 18 (1958). Several United States Supreme Court cases that have scrutinized laws containing gender distinctions lead me to conclude that Michigan's gender-based dower scheme cannot be sustained.

The Equal Protection Clause of the United States Constitution declares that "[n]o

---

[31] Although it is of no constitutional moment that Michigan stands alone among the fifty states with regard to gender-based dower, I believe that this circumstance likely reflects the thinking of our sister states that such a distinction cannot properly be drawn in light of the Supreme Court's equal protection decisions of the past two generations.

State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." US Const, Am XIV.[32] Swartz challenges the Michigan statutory scheme that gives widows, but not widowers, a right and option to elect dower, arguing that it is an unjustified gender-based classification that violates equal protection.

It is readily apparent that the statute recognizing dower interests, MCL 558.1, discriminates on the basis of gender. The statute provides: "The widow of every deceased person, shall be entitled to dower, or the use during her natural life, of 1/3 part of all the lands whereof her husband was seized of an estate of inheritance, at any time during the marriage, unless she is lawfully barred thereof." The statute recognizes a particular property right available only to widows, who are, by definition, always women. There is no corresponding property right available to widowers, who are always men. Michigan's Estates and Protected Individuals Code (EPIC), MCL 700.1101 through 700.8102, uses an identical gender classification in its treatment of surviving spouses. EPIC provides that if an individual died testate, the surviving spouse may elect one of the following:

(a) That the spouse will abide by the terms of the will.

(b) That the spouse will take 1/2 of the sum or share that would have passed to the spouse had the testator died intestate, reduced by 1/2 of the value of all property derived by the spouse from the decedent by any means other than testate or intestate succession upon the decedent's death.

(c) If a widow, that she will take her dower right under sections 1 to 29 of 1846 RS 66, MCL 558.1 to 558.29. [MCL 700.2202(2).] [33]

Thus, under MCL 700.2202(2), a male surviving spouse may choose to abide by the terms of his deceased wife's will, or he may take the elective share described in subdivision b. A female surviving spouse has both of the options that are available to men, but has the additional option to elect to take her dower right.

Given that these two statutes operate by classifying individuals on the basis of gender, the question is whether that classification violates the Equal Protection Clause of the United States Constitution. The level of scrutiny courts must apply to such classifications is well established and is referred to as "intermediate scrutiny." *Clark v Jeter*, 486 US 456, 461 (1988). A party seeking to uphold a statute that discriminates on

---

[32] Given the conclusion that the dower statutes violate the Equal Protection Clause of the United States Constitution, pursuant to the United States Supreme Court's interpretation of this clause, it is unnecessary to address whether the statutes also violate the Equal Protection Clause of the Michigan Constitution, Const 1963, art 1, § 2.

[33] MCL 700.2202(1) provides a similar choice for a widow whose husband died intestate.

the basis of gender has the burden of showing an "'exceedingly persuasive justification'" for the classification. *Mississippi Univ for Women v Hogan*, 458 US 718, 724 (1982) (citation omitted). "The burden . . . is on those defending the discrimination to make out the claimed justification . . . ." *Wengler v Druggists Mut Ins Co,* 446 US 142, 151 (1980). "To withstand constitutional challenge, . . . classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v Boren*, 429 US 190, 197 (1976). In cases involving gender-based classification, the United States Supreme Court has counseled that

> [a]lthough the test for determining the validity of a gender-based classification is straightforward, it must be applied free of fixed notions concerning the roles and abilities of males and females. Care must be taken in ascertaining whether the statutory objective itself reflects archaic and stereotypic notions. Thus, if the statutory objective is to exclude or "protect" members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior, the objective itself is illegitimate. [*Hogan*, 458 US at 724-725.]

The Court has also cautioned that "[l]egislative classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing stereotypes about the 'proper place' of women and their need for special protection." *Orr v Orr*, 440 US 268, 283 (1979). "The State's justification for [a gender-based] classification 'must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.'" *Nevada Dep't of Human Resources v Hibbs,* 538 US 721, 729 (2003) (citation omitted). In sum, to justify a gender-based classification, the proponent of the discriminatory statute must show an exceedingly persuasive justification for the classification, which requires, at the least, that the classification serves important governmental objectives and substantially relates to the achievement of those objectives. *Nguyen v Immigration & Naturalization Service*, 533 US 53, 70 (2001).

As a preliminary matter, it is notable that the United States Supreme Court has been the *most* unyielding in its rejection of gender distinctions in the realm of marital law. See, for example, *Wengler,* 446 US 142 (striking down Missouri's workers' compensation provision that required a widower to prove dependence on his wife's earnings before he could receive death benefits, but did not require a widow to prove dependence on her husband's earnings before she could receive death benefits); *Orr,* 440 US 268 (striking down Alabama's alimony statutes that provided that husbands, but not wives, may be required to pay alimony upon divorce); *Califano v Goldfarb,* 430 US 199 (1977) (striking down the federal Old-Age, Survivors, and Disability Insurance Benefits program, which required a widower to prove dependence on his wife to receive survivors' benefits, but did not require a widow to prove dependence on her husband to receive survivors' benefits); *Weinberger v Wiesenfeld,* 420 US 636 (1975) (striking down the Social Security Act provision that provided benefits to parents of minor children who

were widows, but not widowers); *Frontiero v Richardson*, 411 US 677 (1973) (striking down a federal statute that required a servicewoman's husband to prove dependency in order to obtain increased quarters allowances and medical and dental benefits, but did not require a serviceman's wife to prove dependency to obtain these same benefits); and *Reed v Reed,* 404 US 71 (1971) (striking down an Idaho statute that provided that the husband must be preferred over the wife for the purpose of appointing their son's estate administrator). In such cases, encompassing most of the significant gender discrimination cases of the past two generations, the Court has repeatedly struck down gender distinctions in areas affecting married persons.

Mindful of this precedent, I turn to the first step in equal protection analysis—examining the professed governmental objectives served by providing a dower right to widows but not widowers. There are several potential objectives arguably served by this statutory scheme: offsetting the disabilities of coverture, cushioning the financial effect of spousal loss on the gender that is particularly burdened by such a loss, and remedying historic economic discrimination against women.

The governmental objective of offsetting the disabilities of coverture is easily dismissed given the modern status of married women, but it nonetheless provides relevant historical context. The common law imposed severe economic disadvantages on married women. The term "coverture" was used to describe the condition of being a married woman, which carried the particular disabilities of that status.[34] This Court described some of the disabilities that attached to coverture in *Tong v Marvin*, 15 Mich 60, 66 (1866):

> The control which a husband has over the person and estate of his wife at the common law is so great and so liable to abuse that it has for a long time been the subject of complaint, and of frequent interposition by courts of equity. He had (1) The control of her person, and the right to appropriate her earnings to his own use; *(2) He became by the marriage the owner of such personal estate as she then possessed, and of all that she should thereafter acquire during coverture; (3) He had a right to reduce her choses in action to possession, and to dispose of her chattel interests in lands to his own use;* (4) He became vested with her estate of inheritance during the coverture, and if he survived her, and issue capable of inheriting it had been born to them, he had a life estate therein; and (5) In case of their separation, he had the better right to the control and custody of the children of the marriage. [Emphasis added.]

As relevant here, coverture stripped a married woman of any individual rights to property she owned before the marriage or acquired during the marriage. *Tong* also described "the

---

[34] Black's Law Dictionary (7th ed).

corresponding rights of the wife" at common law as

> (1) A right to support, and to have her debts before marriage paid by the husband; and, (*2) A life interest in the one-third part of his estates of inheritance if she survived him.* To these equity added, (3) An equity to a reasonable settlement, to be made from the property brought by her to the husband, for the support of herself and her children . . . . [*Id*. (emphasis added).]

At common law, dower, a life interest in 1/3 of a husband's estates of inheritance, was designed to offset the burdens of coverture. A woman who owned property before marriage lost ownership of that property when she married, which was a potentially significant economic loss. Once married, any property a woman acquired, such as by inheritance, became the husband's property. In place of the property rights lost, a woman acquired a life interest in 1/3 of her husband's real property. Though not necessarily an equal exchange, dower partially offset the economic loss a woman potentially endured by virtue of marriage. Dower was also a device to protect a surviving spouse against the conveyances or debts of the other spouse. Atkinson, Law of Wills (2d ed), p 107. If a woman's husband conveyed any real property during his lifetime, the conveyance was subject to the widow's dower right, unless she had relinquished it. 15 Powell, Real Property, § 85.20[2][c], p 379. Thus, because of dower rights, a husband cannot convey perfect title to his real property unless his wife consents. In addition, "[s]ince a surviving spouse generally takes a dower or curtesy interest free from debts, these interests may offer more protection than other spousal protection provisions." *Id*. Thus, dower prevented a widow from being forced from her home by her husband's creditors or because her husband had conveyed the property without her consent.

Many of the purposes of dower recognized at common law have vanished with the advancement of women's economic and social rights. Beginning in the nineteenth century, married women's property acts were passed to remove the disabilities of coverture. Married women were given the power to convey and acquire real property, retain ownership of property owned before or during the marriage, sue and be sued as separate legal entities, and enter into contracts.[35] The 1963 Michigan Constitution fully

---

[35] Section 1 of 1855 PA 168 provided:

> That the real and personal estate of every female, acquired before marriage, and all property, real and personal, to which she may afterwards become entitled, by gift, grant, inheritance, devise, or in any other manner, shall be and remain the estate and property of such female, and shall not be liable for the debts, obligations and engagements of her husband, and may be contracted, sold, transferred, mortgaged, conveyed, devised or

abolished the disabilities of coverture.[36]   To the extent that dower's purpose was to balance the restrictions coverture placed on a married woman's ability to own property, modern laws have eliminated the need for this objective.  Accordingly, this particular purpose of dower cannot serve as an important governmental objective.

Of course, proponents of the classification scheme, including Miltenberger, have advanced alternative objectives served by the dower provisions.  In considering these objectives, it is prudent to mind the admonishment of the United States Supreme Court that "[t]he justification [for a classification] must be genuine, not hypothesized or invented *post hoc* in response to litigation."  *United States v Virginia*, 518 US 515, 533 (1996).  The statutes at issue here are little more than recitations of the common law; thus, whether dower under these statutes serves a different or broader purpose than dower served at common law is somewhat questionable.  However, there is some indication that at common law, dower served more purposes than simply compensating for the disabilities of coverture.  Dower may "provide a surviving spouse with a source of support when the other spouse dies, in order to ensure that the surviving spouse will not be left disinherited and destitute . . . ."  28 CJS, Dower and Curtesy, § 2, p 106.  Dower has also been characterized as "a reasonable product of a society in which most wealth consisted of land, and in which there was a desire to provide at least a modest social security for surviving widows."  2 Powell, Real Property, § 15.04[1], p 57.  Thus, there is support for the notion that common-law dower served the broader purpose of providing a means of support for widows, who were presumed to be financially dependent on their husbands, and, therefore, particularly vulnerable after losing a spouse.

Further, the adoption of the current dower provisions indicates that the Legislature believed that dower served more than just the purpose it served at common law.  Even after the disabilities of coverture were entirely abolished by the 1963 Constitution, the

---

bequeathed by her, in the same manner and with the like effect as if she were unmarried.

See also 1911 PA 196; 1917 PA 158.

[36] Const 1963, art 10, § 1 provides:

The disabilities of coverture as to property are abolished.  The real and personal estate of every woman acquired before marriage and all real and personal property to which she may afterwards become entitled shall be and remain the estate and property of such woman, and shall not be liable for the debts, obligations or engagements of her husband, and may be dealt with and disposed of by her as if she were unmarried. Dower may be relinquished or conveyed as provided by law.

Legislature did not repeal Michigan's dower provisions. In 1999, the Legislature repealed the Revised Probate Code (which recognized dower) and replaced it with EPIC, which bore more resemblance to the Uniform Probate Code (UPC). The UPC does not contain any provisions recognizing dower. The EPIC provisions were introduced in 1997 in Senate Bill 209; when the bill was originally drafted, it specifically abolished the right of dower. But the bill was amended to retain the right of dower and a widow's right to elect to take dower; the Legislature enacted this version of the bill. In the absence of any legislative statement of purpose, it must be assumed the Legislature believed that dower still served the purpose of providing a means of support for needy surviving spouses. Dower could also serve the related purpose of compensating women for past discrimination and lower earnings during marriage, which often left them more vulnerable than men following the death of a spouse. The United States Supreme Court has recognized "that assisting needy spouses is a legitimate and important governmental objective." *Orr*, 440 US at 280. Also, "[r]eduction of the disparity in economic condition between men and women caused by the long history of discrimination against women has been recognized as such an important governmental objective." *Califano v Webster*, 430 US 313, 317 (1977). Thus, assuming that gender-based dower advances the purposes of supporting needy surviving spouses and remedying past discrimination, it serves important governmental objectives.

After determining that the governmental objectives are legitimate and important, the discriminatory means employed must be evaluated to determine whether they are substantially related to those objectives. A close relationship between discriminatory means and valid governmental objectives is required "to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women." *Hogan*, 458 US at 725-726. The United States Supreme Court has criticized and invalidated statutes based on "'archaic and overbroad'" generalizations that "employ[] gender as an inaccurate proxy for other, more germane bases of classification." *Craig*, 429 US at 198 (citation omitted).

For example, in *Goldfarb*, 430 US at 216-217, the Court held that the federal Old-Age, Survivors, and Disability Insurance Benefits program, which required a widower to prove dependence on his wife to receive survivors' benefits, but did not require a widow to prove dependence on her husband to receive survivors' benefits, violated the Equal Protection Clause. The Court explained that

> the gender-based differentiation created by [the statute]—that results in the efforts of female workers required to pay social security taxes producing less protection for their spouses than is produced by the efforts of men—is forbidden by the Constitution, at least when supported by no more substantial justification than "archaic and overbroad" generalizations or "old notions," such as "assumptions as to dependency," that are more

consistent with "the role-typing society has long imposed" than with contemporary reality. [*Id.* at 206-207 (citations omitted).]

With these principles in mind, the next question is whether the dower statutes' gender-based classification and the governmental objective of supporting needy surviving spouses are substantially related. It is clear that the gender-based classification relies on generalizations about the economic status of men and women, thereby employing gender as a proxy for need. Rather than limiting dower to surviving spouses who demonstrate that they are indeed left financially vulnerable after the death of a spouse, the dower statutes simply permit all women, but not men, to elect dower. The implicit assumption in this system is that gender can be employed as a proxy for need, and that directing provisions toward women will necessarily reach those surviving spouses who are left vulnerable after losing a spouse.

To justify equating gender with need, Miltenberger has presented several statistics showing that women are more likely to be in poverty than men. For example, Miltenberger notes that women in general were 37 percent more likely than men to be in poverty in 2004, while women over 65 were 71 percent more likely than men to be in poverty.[37] These measures are based on census data from that year, which report that 12 percent of women over 65 were in poverty, compared with 7 percent of men over 65. The statistics that Miltenberger has produced, which show a general correlation between gender and poverty, do not justify substituting gender for need. Intermediate-level scrutiny requires a much closer connection before a law can use gender to presume that a particular condition is met.

This is not the first time general statistics have been proffered to justify a discriminatory scheme. The United States Supreme Court has offered guidance on this matter. The Court has refused to rely on generalizations even if those generalizations are supported by statistics. In *Weinberger*, 420 US at 653, the Court held that the Social Security Act provision that provided benefits to widows, but not widowers, violated the equal-protection guarantee of the Fifth Amendment's Due Process Clause. The Court explained:

> Obviously, the notion that men are more likely than women to be the primary supporters of their spouses and children is not entirely without empirical support. But such a gender-based generalization cannot suffice to justify the denigration of the efforts of women who do work and whose earnings contribute significantly to their families' support. [*Id.* at 645 (citation omitted).]

---

[37] Legal Momentum, Reading Between the Lines: Women's Poverty in the United States, 2004 (2004), p 1.

While in some contexts the term "generalization" might be understood to mean a notion that is entirely unverified by evidence, the Court has understood this term to encompass even notions that *are* supported by some evidence.  As one commentator has explained:

> [T]he Court has recognized that stereotypes, although empirically grounded, may be rational and impermissible at the same time. . . . [Therefore,] even when the generalization is empirically supported, the Court has rejected statutes that classified overbroadly by gender if more accurate and impartial distinctions might have been made.  [Alexander, *Nguyen v INS: The Supreme Court Rationalizes Gender-Based Distinctions in Upholding an Equal Protection Challenge*, 35 Creighton L R 789, 844-845 (2002).]

The Court has made it clear that a "substantial relationship" requires a palpable connection between gender and the trait for which it serves as a proxy; this is evident from the traits that have been held *not* to be substantially related to gender, even though a substantial correlation exists.  For example, the Court invalidated an Oklahoma statutory scheme that prohibited the sale of beer to males under the age of 21 and females under the age of 18, in which the proffered rationale was traffic safety.  *Craig*, 429 US at 192, 199-200.  Consulting the statistics provided by the proponents of the classification, the Court noted that "[t]he disparities in 18-20-year-old male-female arrests [in 1973] were substantial for both categories of offenses:  427 versus 24 for driving under the influence of alcohol, and 966 versus 102 for drunkenness."  *Id.* at 200 n 8.  The most relevant survey, the study of alcohol-related driving offenses among 18 to 20-year-olds, "broadly establish[es] that .18% of females and 2% of males in that age group were arrested for that offense."  *Id* at 201.  Yet, the Court concluded that although the correlation was not statistically trivial, "if maleness is to serve as a proxy for drinking and driving, a correlation of 2% must be considered an unduly tenuous 'fit.'"  *Id.* at 201-202.  Moreover, a correlation of just 2% was far more tenuous than other correlations that have been rejected as insufficient.  "Indeed, prior cases have consistently rejected the use of sex as a decisionmaking factor even though the statutes in question certainly rested on far more predictive empirical relationships than this."  *Id.* at 202.  For example, in *Reed*, 404 US at 71, the Court surmised that the state's "apparent premise that women lacked experience in formal business matters (particularly compared to men) would have proved to be accurate in substantially more than 2% of all cases."  *Craig*, 429 US at 202 n 13.  Despite the demonstrated validity of certain generalizations, the Court had found the "empirical defense of mandatory dependency tests for men but not women to be unsatisfactory, even though we recognized that husbands are still far less likely to be dependent on their wives than vice versa."  *Id.*  Thus, the statistics presented in *Craig* did not establish that gender "represents a legitimate, accurate proxy for the regulation of drinking and driving."  *Id.* at 204.  Indeed, "proving broad sociological propositions by statistics is a dubious business, and one that inevitably is in tension with the normative philosophy that underlies the Equal Protection Clause."  *Id.*  The Court concluded that

"the principles embodied in the Equal Protection Clause are not to be rendered inapplicable by statistically measured but loose-fitting generalities concerning the drinking tendencies of aggregate groups." *Id*. at 208-209.

In the case at hand, the difference in poverty rate between the genders fails to justify employing gender as a proxy for need under *Craig*. In 2004, 12 percent of women over 65 were in poverty, while only 7 percent of men were in poverty.[38] This, of course, reflects a verifiable disparity. But using gender in order to reach the 12 percent of women who are in poverty is similar to using a gender-based ban on alcohol to reach the 2 percent of men who would drink and drive. *Craig*'s admonition that even correlations that are substantially more accurate than 2 percent have failed intermediate scrutiny is instructive, and compels my conclusion in this case. To say that gender is an imperfect proxy for need is an understatement. It is a grossly inaccurate proxy in that it is potentially overinclusive by 88 percent—namely, it extends dower to the 88 percent of elderly women who *do not* live in poverty. At the same time, it summarily denies dower to the 7 percent of elderly men who are in poverty. The correlation presented by Miltenberger is similar to that established in *Craig*; both show a verifiable connection between gender and a characteristic, but are constitutionally insufficient to establish a legitimate and accurate proxy for classification purposes.[39]

---

[38] It is worth noting that the proffered statistics report poverty rate among *individuals over 65 years of age*, not specifically among *surviving spouses*. While widows and widowers quite naturally tend to be elderly, it would be advisable to use these statistics cautiously in light of their inherent inaccuracies. Moreover, an individual's income, as calculated by the census bureau, is not a definitive assessment of need, particularly the type of need that would be addressed by the remedy of dower. Specifically, the income calculation does not account for the value of assets, such as a home, that are owned by the individual. Similarly, the census bureau's poverty calculation does not include capital gains or the value of assets owned by an individual. <http://www.census.gov/hhes/www/poverty/povdef.html> (accessed July 17, 2008).

[39] Of course, being in poverty is only one way of measuring whether a surviving spouse is particularly needy after losing a spouse. In fact, Miltenberger's statistics reveal that men experience a greater proportional loss of income than women after losing a spouse: In 2005, the median income of married men was $39,789, while the median income of widowed men was $20,116, a reduction of 49 percent. Marital Status—All Races 18 Years Old and Over by Median Income and Sex: 1974 to 2006, <http://www.census.gov/hhes/www/income/histinc/p13ar.html> (accessed June 16, 2008). By contrast, the median income of married women was $20,236, while the median income of widowed women was $14,961, a reduction of 26 percent. *Id*. These statistics are only offered by way of illustration; I acknowledge that this data is rudimentary and does not account for the effect that variables such as age and retirement would have on earnings independent of losing a spouse. Regardless, it calls into question

In sum, because widows are free to elect dower without regard to need, the dower provision potentially benefits all widows, whether needy or not, but likewise deprives all needy widowers from the same protection. Permitting widows, but not widowers, to elect dower is not substantially related to the objective of providing support for needy surviving spouses because it is overinclusive with respect to widows but underinclusive with respect to widowers.

Further, the Court has held that using gender as a proxy for need is unwarranted when nondiscriminatory means of determining need are equally available. In *Wengler*, 446 US at 152*,* the United States Supreme Court held that Missouri's workers' compensation provision that required a widower to prove dependence on his wife's earnings before he could receive death benefits, but did not require a widow to prove dependence on her husband's earnings before she could receive death benefits, violated the Equal Protection Clause. The Court explained that although "[p]roviding for needy spouses is surely an important governmental objective, . . . the needs of surviving widows and widowers would be completely served either by paying benefits to all members of both classes or by paying benefits only to those members of either class who can demonstrate their need." *Id.* at 151. The Court explained that the only justification for the disparate treatment was "the assertion that most women are dependent on male wage earners and that it is more efficient to presume dependency in the case of women" and to only require those few men who are financially dependent on their wives to prove such dependency. *Id.* However, the Court held that the bare assertion of "administrative convenience" does not justify gender-based discrimination. *Id.* at 151-152.

Similarly, in *Orr,* the Court invalidated a statutory scheme providing that husbands, but not wives, may be ordered to pay alimony. *Orr*, 440 US at 270. The Court acknowledged the validity of two legislative purposes of the statutory scheme: assisting needy spouses (using gender as a proxy for need), and compensating women for past discrimination. *Id*. at 280. Nevertheless, the Court determined that the scheme was invalid. The Court observed that "even if sex were a reliable proxy for need, and even if the institution of marriage did discriminate against women," the statute already provided for individualized hearings at which the parties' financial circumstances were considered. *Id*. at 281-282. Therefore, "[n]eedy males could be helped along with needy females with little if any additional burden on the State. In such circumstances, not even an administrative-convenience rationale exists to justify operating by generalization or proxy." *Id*. at 281. Similarly, individualized hearings could determine which women were actually discriminated against, and conversely, which family units left the husband dependent on the wife. *Id*. at 281-282. The Court observed that the statutory purposes could be accomplished without the gender-based classification, at no additional cost to the state. *Id*. at 282. Accordingly, "'the gender-based distinction is gratuitous; without it,

---

Miltenberger's assertion that gender can predict with sufficient accuracy whether losing a spouse leaves an individual in an economically vulnerable position.

the statutory scheme would only provide benefits to those men who are in fact similarly situated to the women the statute aids,' . . . and the effort to help those women would not in any way be compromised." *Id.*, quoting *Weinberger*, 420 US at 653. The Court concluded that "[w]here . . . the State's compensatory and ameliorative purposes are as well served by a gender-neutral classification as one that gender classifies and therefore carries with it the baggage of sexual stereotypes, the State cannot be permitted to classify on the basis of sex." *Orr*, 440 US at 283.

At the very least, *Orr* teaches that gender classifications may not be gratuitous; when there is a nondiscriminatory method for achieving the same objective desired by the government, using gender as a broad proxy for reaching that objective is unwarranted. The dower provisions cannot survive *Orr*'s pronouncement. If the objective of the dower provisions is to provide security for needy surviving spouses, nondiscriminatory methods of achieving this objective would serve this goal equally well, if not better.[40] Dower provisions that apply to both males and females equally would serve the objective of providing security for needy spouses, at no additional cost or burden to the state. Providing a dower right to widowers would not affect or impair widows' dower rights. Dower provisions that apply to those spouses who demonstrate an actual need for dower would also serve the objective of providing security for needy spouses. Because the state's objectives could be served by nondiscriminatory means, the dower provisions' gender classification is gratuitous and constitutionally impermissible under *Orr*.

Further, the discriminatory dower provisions are not substantially related to the objective of providing for needy spouses because they are poorly designed to achieve this objective. In most cases, dower provides less economic benefit to a widow than the elective share described by MCL 700.2202(2)(b). The dower provisions only afford meaningful assistance in circumstances that are unlikely to arise in modern times. As commentators have noted, "[w]hile dower may have worked fairly well in cases of the more fortunate families in agrarian society, it is not usually adequate in the present condition of urban living in which the average person owns nothing except personalty and perhaps a single residence." *Atkinson, supra* at 107. Dower is "an inadequate form of social security in current time since it only gives rights in realty, while current wealth is concentrated in personal property." 2 Powell, Real Property, § 15.08, p 95-96. Dower does not directly remedy the economic conditions of widows, unlike a property-tax exemption or increased social security benefits. Dower potentially provides a widow a place to live or a source of rental income, but this benefit is contingent on having been

---

[40] While I will not today determine the constitutionality or feasibility of a hypothetical gender-neutral dower scheme, in response to Justice Corrigan's suggestion that the Legislature may be precluded from adopting a gender-neutral dower scheme because such a scheme would "compromise vested property rights," *ante* at 18, I simply note that perhaps the Legislature could draft a scheme that would avoid Justice Corrigan's concerns by applying gender-neutral dower prospectively only.

married to a landowning husband.  It would stand to reason that many of the neediest widows had been married to men who did not own real property, so dower does not aid them at all when they lose their spouse.  For dower's classification to be substantially related to the goal of providing assistance to needy surviving spouses, it must demonstrably *serve* that goal; given modern realities, it does not.

In contrast to dower's limited utility in modern times, it is telling that dower served to directly remedy a number of disabilities of coverture that existed at common law.  The close fit between dower's remedy and the disabilities of coverture, compared with the tenuous fit between dower's remedy and the circumstances of modern needy surviving spouses, leads to the inference that dower is, and has always been, truly designed to substantially relate to offset the disabilities of coverture.  Contending that dower now substantially relates to remedying modern economic disparities, even though dower has remained unchanged since common law times, is indicative of a justification that has been advanced "*post hoc* in response to litigation."  *Virginia*, 518 US at 533.

In sum, dower does not substantially relate to the objective of aiding surviving spouses who are particularly vulnerable after the loss of a spouse because its classification employs a grossly overbroad proxy to reach that population, while gender-neutral provisions would serve the objective just as well.  Moreover, dower does not adequately serve the particular objective that it ostensibly addresses.

Miltenberger has offered additional objectives ostensibly served by dower, such as remedying economic discrimination women have suffered during marriage.  Miltenberger argues that widows are more likely than widowers to be needy following the death of a spouse because married women generally earn less money than married men.  But like the goal of assisting needy surviving spouses, the provision's classification does not substantially relate to this objective.  Miltenberger has presented statistics showing that married women earned a median income of $20,236 in 2005, while married men earned a median income of $39,789.[41]  Miltenberger notes that this demonstrates that the median income of married women was 51 percent of the median income of married men in 2005.[42]  The census data referenced by Miltenberger establish that generally, men earn more than women of the same marital status.[43]  *Id*.  Miltenberger argues that these statistics reflect that, despite progress toward equality, women are still economically disadvantaged relative to men and are left more vulnerable after losing a spouse because

---

[41] Marital Status, *supra*.

[42] *Id*.

[43] It should be noted that this disparity should not necessarily be attributed to gender discrimination in the workforce.  The fact that women generally make less money than men may sometimes arise out of decisions to stay at home or work part-time to care for their families.

they have enjoyed less earning power during their married life and afterwards.

The value of these general statistics is questionable. As a threshold matter, the statistics Miltenberger has presented regarding income disparity suffer from the same limitations as those used to justify using gender as a proxy for need. Namely, the United States Supreme Court has warned that "proving broad sociological propositions by statistics is a dubious business, and one that inevitably is in tension with the normative philosophy that underlies the Equal Protection Clause." *Craig*, 429 US at 204. In addition, Miltenberger must demonstrate a gender-based difference within the narrow population reached by MCL 700.2202(2)—surviving spouses.[44] If the classification in § 2202(2) is justifiable, it must be justified by showing that gender is a valid proxy for need within this population. Thus, statistics showing the economic disparities present in the general population are of limited relevance to discerning whether the gender-based classification is substantially related to addressing an actual condition present in the population reached by § 2202(2).

However, considering only the evidence of disparate income among male and female surviving spouses, it is apparent that the correlation between gender and need is even weaker than the correlation between gender and alcohol-related driving offenses that was considered insufficient in *Craig*. In *Craig*, the Court refused to generalize on the basis of statistics that showed that the arrest rate among men was *eleven times* higher than the arrest rate among women.[45] In the present case, the 2005 census data shows that widowed men earned a median income that was about a third higher (34 percent) than the median income of widowed women. While one difficulty of engaging in this statistical analysis is that it does not permit us to compare truly equivalent units, a disparity by a factor of a third is statistically less drastic than the disparity by a factor of eleven that was rejected in *Craig*.

Moreover, if dower is meant to remedy the income gap between married women and married men, it only does so in a loosely related way—by providing a life estate in a portion of lands owned by a woman's husband—not by more direct means of reallocating income or other personal wealth. Dower is not designed to particularly compensate the economic discrimination women have suffered during their marriage; it is available to widows regardless of their need or employment history. As I have already noted, dower

---

[44] Technically, the group reached by MCL 700.2202(2) only includes surviving spouses of individuals who have died testate. This distinction is not significant, however, because MCL 700.2202(1) applies a synonymous gender classification to surviving spouses of individuals who have died intestate.

[45] Again, in *Craig*, 429 US at 201, the proponent of the classification showed that the arrest rate for women of that age was 0.18 percent while the corresponding rate for men was 2 percent.

is beneficial only under uncommon circumstances, which occur independently from the circumstances of a particular woman's income history. The loose relationship between the rights afforded by dower and the objective of remedying past discrimination is apparent when contrasted with a compensatory scheme that was upheld by the United States Supreme Court. In *Webster*, the Court upheld a portion of the Social Security Act that provided different methods of computation of social security benefits based on the gender of the worker. A female worker could exclude from the computation of her average monthly wage three more lower-earning years than a male worker could exclude, resulting in a slightly higher average monthly wage and a correspondingly higher level of monthly old-age benefits for the retired female worker. *Id.*, 430 US at 315-316. The Court upheld the scheme, observing that "allowing women, who as such have been unfairly hindered from earning as much as men, to eliminate additional low-earning years from the calculation of their retirement benefits works *directly* to remedy some part of the effect of past discrimination." *Id.* at 318 (emphasis added). The scheme was constitutional because the remedy of disregarding lowest-earning years was directly related to the particular harm it sought to address—the demonstrated income disparity between the genders. By contrast, dower's remedy of providing a life estate in a portion of a husband's lands is only collaterally related to income disparity. In fact, the relationship is so attenuated that it again raises the inference that dower is truly only substantially related to the primary goal it served at common law—offsetting the disabilities of coverture. Because dower's gender-based classification is not substantially related to an important governmental objective, I would conclude that MCL 558.1 and MCL 700.2202(2) are unconstitutional.

The statute that recognizes dower interests, MCL 558.1, is unconstitutional on another ground. That provision creates a dower right in a husband's lands in favor of his widow, but no corresponding right in a wife's lands in favor of her husband. It impairs a married man's ability to convey real property, but does not similarly disadvantage a married woman. A married man cannot convey his property without the consent of his wife, but a married woman is free to convey her property without the consent of her husband. The ability to convey one's property without the consent of another is a valuable right; as Justice Corrigan observes, if a man wishes to convey property and his wife does not consent, presumably "the wife's contingent rights are reflected in a lower purchase price." *Ante* at 17. Permitting a married woman, but not a married man, to convey perfect title to property without spousal consent is a classification that rests on "no more substantial justification than 'overbroad' generalizations, . . . such as 'assumptions as to dependency,' that are more consistent with 'the role-typing society has long imposed,' than with contemporary reality." *Goldfarb*, 430 US at 207 (citations omitted). The classification "reinforc[es] stereotypes about the 'proper place' of women and their need for special protection." *Orr*, 440 US at 283. The implicit assumptions of this classification reflect stereotypes—as that term is used by the United States Supreme Court—about both genders: that wives are dependent on their husbands, but husbands are not dependent on their wives; that men are more likely to abandon their spouses and

must be reined in by a financial tether; that married men, not married women, tend to own property; and that husbands typically have the decision-making power in the marriage, while wives remains oblivious to their husbands' "business."[46] These notions are overbroad and constitutionally inadequate for justifying a gender-discriminatory scheme.

Although holding the gender-based dower provisions unconstitutional would reduce the options available to widows, it would not represent a consummate loss to women. Discriminatory statutes that are designed to benefit a traditionally disadvantaged group may actually impair the interests of individuals who contravene stereotypes. The dower provisions not only deny men a right that is granted to women, but also constrain the ability of landowning women to protect their husbands from their creditors after their death. Precluding men from asserting a dower right in their wife's lands provides female landowners fewer protections than male landowners. Moreover, to the extent that gender-based dower perpetuates stereotypes about men and women, both genders would benefit from its termination. Finally, even if this Court were to hold the dower provisions unconstitutional, the rights and equities at stake would likely warrant applying the holding with limited retroactivity, thus applying the decision only to the case at hand and to pending cases in which the same issue had been raised.

Aside from the jurisprudential significance of this case, I would also consider the merits because the Court of Appeals decided this case in a published opinion. *In re Miltenberger Estate*, 275 Mich App 47 (2007). The Court of Appeals erred in overlooking *Craig* and *Orr* in favor of *Kahn v Shevin*, 416 US 351 (1974), which upheld a Florida law that awarded widows a $500 property tax exemption while providing no corresponding benefit to widowers. While *Kahn* has not been overruled, it cannot be treated as purely analogous to the present case, because it was decided before the Court established that gender-based classifications are subject to intermediate-level scrutiny. *Kahn* applied the highly deferential rational-basis standard of review: "We deal here with a state tax law reasonably designed to further the state policy of cushioning the financial impact of spousal loss upon the sex for which that loss imposes a disproportionately heavy burden." *Kahn*, 416 US at 355. In addition, *Kahn* relied heavily on the fact that the provision at issue was a tax provision, stating, "[w]e have long held that [w]here taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation." *Id*. (citation omitted).[47] *Kahn*

---

[46] The delegates to the 1961 Constitutional Convention were more forthright about the assumptions underlying dower than perhaps we are today, as illustrated by the remark that dower "mean[s] that *a husband who normally takes care of things* cannot get rid of all his property without his wife having to sign off." See *ante* at 6.

[47] Justice Corrigan appears to misconstrue this quote as indicating that states have leeway in making classifications *unless* equal protection is imperiled, but it actually indicates that

has some application to the instant case, as both involve disparate treatment of widows and widowers; but it is critical to recognize that *Kahn* was not decided under the current standard of review for gender classification cases. Therefore, it is more appropriate to evaluate dower's constitutionality under the guidance of *Craig* and *Orr*, which applied intermediate scrutiny.

In addition, the Court of Appeals reference to dower's recognition in the Michigan Constitution is potentially misleading. The fact that the Michigan Constitution refers to dower, providing that "[d]ower may be relinquished or conveyed as provided by law," does not bear on whether the dower provisions enacted by the Legislature violate equal protection. Const 1963, art 10, § 1. The directive that dower may be relinquished or conveyed is not an endorsement of the institution of dower, but merely a notification that the Legislature may pass laws concerning the conveyance of dower rights. Accordingly, determining that Michigan's dower provisions violate equal protection does not fail to afford article 10, § 1 equal dignity; invalidating the discriminatory dower provisions does not infringe on Legislature's ability to pass laws concerning the relinquishment or conveyance of dower.

Before concluding, I wish to respond to Justice Corrigan's concurrence. Justice Corrigan concludes that Michigan's discriminatory dower statute is sufficiently related to its goals to survive equal protection review. But to reach this conclusion, she relies on an incorrect standard of review, minimizes the relevance of controlling United States Supreme Court precedent, and eases the burden applicable to the proponent of the classification.

While Justice Corrigan purports to apply intermediate-level scrutiny, her analysis indicates otherwise. Her statement repeatedly insinuates that I would apply strict scrutiny by requiring dower to be *perfectly* related to its goals. In fact, I never hold dower to such a high standard or even once mention the word "perfect" in my discussion of the fit between the statute's classification and its goals. Meanwhile, Justice Corrigan wages a vigorous one-sided argument to counter the suggestion that dower must be perfectly

---

tax-related classifications enjoy particular deference when courts evaluate whether the classification violates equal protection. *Ante* at 12-13. For example, the United States Supreme Court observed that in an Equal Protection Clause challenge, "[t]he appropriate standard of review is whether the difference in treatment . . . rationally furthers a legitimate state interest. . . . This standard is especially deferential in the context of classifications made by complex tax laws." *Nordlinger v Hahn*, 505 US 1, 11. Accordingly, between *Kahn*'s reference to the deferential standard accorded to tax-related classifications, and its use of rational-basis language, there is ample indication that *Kahn* applied a more deferential standard of review to the law at issue in that case than the intermediate scrutiny that applies to the provisions here.

related to its goals.[48] This argument is a red herring, both because it is nonresponsive to my position and because it implies that if equal protection does not require a *perfect* fit between a classification and its goals, then it only requires a rational one. Notably, Justice Corrigan's rhetoric is similar to language that the United States Supreme Court has employed when it has applied rational-basis scrutiny, the most deferential standard. "But where rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.'" *Nguyen,* 533 US at 77-78, quoting *Dandridge v Williams*, 397 US 471, 485 (1970).

Justice Corrigan's statement also purports to apply intermediate scrutiny, but essentially applies rational-basis review by following *Kahn* rather than heeding the directives set by *Orr* and *Craig*. I will not reiterate the arguments presented earlier, but I must address in particular the distinction drawn between this case and *Craig*. Justice Corrigan distinguishes *Craig* because the correlation between gender-based dower and its goals "rests on more than the mere 'loose-fitting generalities'. . . presented in *Craig*." *Ante* at 15. Justice Corrigan argues that, unlike *Craig*, this case presents "a clear correlation between widows and economic need, as well as past economic discrimination." *Ante* at 15. However, when the statistics presented in *Craig* are compared with the relevant statistics presented in this case, it is apparent that there is no sound basis for distinguishing *Craig*. See pages 37 and 41 of this statement. Justice Corrigan also distinguishes *Craig* because the statute in *Craig* was designed to promote traffic safety, rather than the "'laudatory purpose[]'" of remedying economic disparity. *Ante* at 13, quoting *Craig*, 429 US at 198 n 6. Justice Corrigan seems to imply that courts applying intermediate scrutiny are more deferential to statutes serving clearly laudatory purposes. If so, this distinction is unfounded. The *Craig* Court did not hold the statute unconstitutional because it failed to serve an important government objective; the Court held the statute unconstitutional because it was not substantially related to that objective. In this case, the validity of the dower provisions' objectives are not seriously disputed; the controlling inquiry is the sufficiency of the relationship between the objectives and the provisions' classifications. Accordingly, even though the statute in *Craig* was not aimed at remedying economic discrimination, the Court still applied intermediate scrutiny, and its consideration of the relationship between that statute's classification and

---

[48] "The dissent's point is well-taken, however, that gender is an imperfect proxy for need among surviving spouses." *Ante* at 3. "[T]he Court did not hold the Social Security Act benefits scheme at issue in *Weinberger* unconstitutional because it employed gender as an imperfect proxy for need." *Ante* at 16. "But dower is not *unconstitutional* merely because it is imperfect." *Ante* at 16. "[D]ower is not a perfect proxy for need or a complete remedy for past discrimination even within the relevant population of surviving spouses. But dower is not as imperfect—or as easily replaced—as the dissent suggests." *Ante* at 18. "Although imperfect, the dower scheme is substantially related to the particular economic disadvantages suffered disproportionately by widows in Michigan." *Ante* at 27.

its goals is entirely applicable to the instant case. The conclusion that Michigan's dower statute is not substantially related to any of its purported objectives is supported, and indeed compelled, by *Craig* and the modern Supreme Court cases applying intermediate scrutiny to gender-discriminatory statutes.

In addition, Justice Corrigan fails to recognize that this case involves a dispute that falls within a subclass of gender discrimination cases, i.e., gender discrimination in the realm of marital law. As discussed earlier, the United States Supreme Court has been the *most* unyielding in its rejection of gender distinctions in this particular subclass of cases. However, unlike race-based or nationality-based distinctions, in which strict scrutiny has resulted in virtually *no* tolerance for statutory distinctions between people of different races or nationalities, intermediate scrutiny has resulted in the acceptance of some gender-based distinctions, e.g. *Rostker v Goldberg*, 453 US 57 (1981) (upholding the Military Selective Service Act, which authorizes the President to require the registration for possible military service of males, but not females)—but simply not in the realm of marital law. Thus, when she equates strict scrutiny with the intermediate scrutiny that I employ in this case, *ante* at 3, she fails to account for the Court's treatment of the subclass of gender discrimination cases in the realm of marital law. In fact, Justice Corrigan effectively concedes that my approach is consistent with prevailing United States Supreme Court law when she observes that "Justice Cavanagh's analysis resembles strict scrutiny in part because the Supreme Court's analyses resemble strict scrutiny, particularly in the post-*Kahn* marital arena." *Ante* at 24. This Court is bound to follow Supreme Court precedent, regardless of whether there are dissenting voices that criticize those decisions.

Finally, Justice Corrigan eases the burden on the proponent of the classification by supplying data and arguments in support of the classification beyond that which the proponent presented. Offering unsolicited assistance to the proponent of a classification is a hallmark of rational-basis review, not intermediate scrutiny. Courts applying rational-basis review must uphold classifications "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v Doe by Doe*, 509 US 312, 320 (1993). By contrast, under intermediate scrutiny, "[t]he burden of justification is demanding and it rests entirely on the State." *Virginia*, 518 US at 533. Justice Corrigan does not adhere to this burden by considering *only* the data and arguments advanced by Miltenberger. For example, Justice Corrigan offers statistics relating to social security benefits that were never mentioned by Miltenberger. *Ante* at 9-10. Justice Corrigan also augments Miltenberger's position by *sua sponte* advancing the argument that the classification is justified because women have longer life expectancies, and by supplying a vital statistics report that was not referenced by Miltenberger. *Ante* at 9-10. Justice Corrigan acknowledges that she has eased Miltenberger's burden, but argues that such treatment is necessary because only a single private attorney presented a defense of the scheme. *Ante* at 3 n 4. I disagree with the proposition that the proponent's burden should be eased merely because the proponent is represented by a single private

attorney. Moreover, even if the state had been better equipped to defend these statutes, I would not supply the state's arguments in this case simply because the state declined to participate. The constitutional issue presented was readily apparent from our grant order in this case. *In re Miltenberger Estate*, 480 Mich 976 (2007). The state could have filed an amicus curiae brief, but did not. MCR 7.306(D). The state, acting through the Attorney General, could have also moved to intervene at any stage of this case if it was interested in defending the constitutionality of gender-based dower, but it did not. See MCL 14.28, MCL 14.101.

In conclusion, I dissent from the order in this case that vacates our order granting leave to appeal. I would determine the merits of this case, holding that the gender-discriminatory dower scheme found in MCL 700.2202(2) and MCL 558.1 violates the Equal Protection Clause of the United States Constitution.

MARKMAN, J., joins the statement of CAVANAGH, J.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

July 31, 2008

Clerk

t0728